**UNITED STATES of America, Plaintiff-Appellee,**

v.

**CONSOLIDATED LAUNDRIES CORPORATION; Cascade Linen Supply Corp. of N. J.; Central Coat, Apron & Linen Service, Inc.; General Linen Supply & Laundry Co., Inc.; Modern Silver Linen Supply Co., Inc. (a New York corporation); Modern Silver Linen Supply Co., Inc. (a New Jersey corporation); Standard Coat, Apron & Linen Service, Inc. (a New York corporation); Standard Coat, Apron & Linen Service, Inc. (a New Jersey corporation); Linen Supply Institute of Greater New York, Inc.; Linen Service Council of New Jersey; Louis Gordon; Harry Kessler; Charles Maslow; Jack Orlinsky; Fred S. Radnitz; and Sam Spatt, Defendants-Appellants.**

Nos. 168, 169, Dockets 25533, 26330.

United States Court of Appeals Second Circuit.

Argued Dec. 14, 1960.

Decided May 31, 1961.

Rehearing Denied Aug. 3, 1961.

Simon H. Rifkind, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Jay H. Topkis, New York City, on the brief), for defendant-appellant Consolidated Laundries Corp.

Samuel I. Rosenman, of Rosenman, Goldmark, Colin & Kaye, New York City (Seymour D. Lewis, Asa D. Sokolow, and John A. Kauffmann, New York City, on the brief), for defendants-appellants Central Coat, Apron & Linen Service, Inc., Standard Coat, Apron & Linen Service, Inc. (a New York corporation), Standard Coat, Apron & Linen Service, Inc. (a New Jersey corporation), Charles Maslow and Sam Spatt.

John F. Sonnett, of Cahill, Gordon, Reindel & Ohl, New York City (Ralph C. Menapace, Jr., New York City, on the brief), for defendants-appellants General Linen Supply and Laundry Co., Inc. and Cascade Linen Supply Corp. of New Jersey.

Whitney North Seymour, of Simpson, Thacher & Bartlett, New York City (Richard Hawkins and T. F. Gilroy Daly, New York City, on the brief), for defendants-appellants Modern Silver Linen Sup-

ply Co., Inc. (a New York corporation), Modern Silver Linen Supply Co., Inc. (a New Jersey corporation), and Louis Gordon.

Herbert M. Wachtell, of Jaffe & Wachtell, New York City (David Jaffe, New York City, on the brief), for defendant-appellant Fred S. Radnitz.

Mervin C. Pollak, New York City (Norman M. Sheresky, New York City, on the brief), for defendants-appellants Linen Supply Institute of Greater New York, Inc., Linen Service of New Jersey, Harry Kessler, and Jack Orlinsky.

Richard A. Solomon, Henry Geller, Washington, D. C., John J. Galgay, New York City, and Morris F. Klein, Attys., Dept. of Justice, Washington, D. C. (Robert A. Bicks, Asst. Atty. Gen., and Michael I. Miller, Washington, D. C., and John D. Swartz, Attys., Dept. of Justice, New York City, on the brief), for plaintiff-appellee.

Before SWAN, WATERMAN and MOORE, Circuit Judges.

SWAN, Circuit Judge.

The appellants were convicted on both counts of a two count indictment returned on January 31, 1957, charging violations of sections 1 and 2 of the Sherman Act, as amended, 15 U.S.C.A. §§ 1, 2. After pleading not guilty, the sixteen defendants waived trial by jury. Trial began before Judge Palmieri on January 20, 1958 and the Government rested on March 12. The defendants then moved for acquittal. Their motions being denied, they rested without introducing any evidence. On June 16, 1958 the trial judge filed findings of fact and conclusions of law which denied the motions for acquittal and found all the defendants guilty. Fines aggregating $451,000 were imposed, and four individual defendants were given short prison sentences and were ordered to pay the costs of the prosecution. Each defendant duly appealed from the judgment against him. Thereafter, on November 20, 1959, all defendants moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. Their motions, submitted on affidavits, were argued in January 1960 and were denied on April 25, 1960. From this order the defendants have also appealed.

The record covering both appeals presents many questions. Various legal points are common to several appellants, and the court wishes to express to counsel its appreciation of their skill in having so organized their briefs and arguments as to avoid unnecessary repetition.

The defendants-appellants are eight corporations engaged in the linen supply business in New York and/or New Jersey (herein referred to as "linen supplier defendants"), two incorporated trade associations referred to respectively as "New York Institute" and "New Jersey Council" and six individuals, of whom four are officers of one or more of the linen supplier defendants and the other two are respectively the secretary of the New York Institute and the secretary of the New Jersey Council.

The linen supply business consists of periodically delivering to customers, such as hotels, restaurants, barbershops and doctors' offices, supplies of clean linen and picking up soiled linen to be laundered and returned to the customer clean. Frequently the linen supplied to a customer is owned by the linen supplier and when this is the case it may involve a substantial investment by the linen supplier.

Count one of the indictment charged that beginning in or about 1943 and continuing thereafter to the date of the return of the indictment the defendants and unnamed co-conspirators engaged in an unlawful conspiracy to restrain interstate commerce in linen supplies in violation of section 1 of the Sherman Act, as amended, and agreed to allocate customers among themselves, to refrain from competing with each other for customers so allocated, to impede, injure, obstruct, or buy out competing non-member linen suppliers in order to compel them to join the conspiracy or to exclude them from the industry, and to impose penalties upon members of the defendant trade asso-

ciations who failed to conform to the terms of the conspiracy.

Count two incorporated the allegations of count one and charged that the defendants and co-conspirators engaged in an unlawful conspiracy "to monopolize the aforesaid interstate trade and commerce in linen supplies" in violation of section 2 of the Sherman Act, as amended.

## I. THE NEW TRIAL APPEAL

The first matter to be considered is denial of the defendants' motion for a new trial. Their motion was based primarily on the discovery after trial of 43 unnumbered documents in the Government's files which they argue were material to the conduct of their defense.[1] They contend that they were denied due process by reason of the Government's failure to make available to them during the trial the contents of the "Owen File."[2]

For an understanding of the matters in dispute on the new trial motion some preliminary statement is necessary as to the contents of the Owen File, how the 43 documents contained therein came into the Government's possession, and their relevance to testimony given at the trial by the prosecution's witness Paul Ullman. The documents were papers which belonged to Ullman or his corporation New Sanitary Towel Supply, Inc., of which he was president. In order to prepare its case for trial the Government by use of subpoenas took possession of many documents belonging to Ullman or New Sanitary. No receipts were given for the

material so taken. Before trial the prosecution was ordered by Judge Dimock to turn over to defense counsel all documents "furnished to or obtained by the Government, by any means" which were "material to the proof of the issues in this case or to the preparation of the defense of any of the defendants." At the trial Ullman testified that New Sanitary had competed with defendants and had taken customers away from them. Thereupon, he continued, New Sanitary had been subjected to retaliatory economic attacks by defendants acting in concert, which resulted in his being forced to sell New Sanitary to defendants at a sacrifice price. Although the Government's proof included evidence of alleged wrongs by defendants not directed against New Sanitary, Ullman was at least, in the words of the trial judge, "an important Goverment witness who gave extensive testimony at the trial." A large part of the trial transcript concerns the Ullman story. During Ullman's examination at trial the trial court directed the Government to permit defense counsel to inspect all documents relating to Ullman's story, which by then had become evident to be crucial testimony on behalf of the prosecution. In supposed compliance with the orders, the Government did turn over for inspection certain files relating to the case. But these did not include the papers subsequently found in the "Owen File."[3]

Of these papers one falls in a class apart from the other 42 documents. This is a letter from Ullman to the New York

[1]. The grounds asserted in the motion were "that (1) the defendants were denied due process of law, (2) newly discovered evidence requires a new trial, and (3) the failure of the prosecutor to produce a statement of a witness violated the provisions of Title 18 U[S]CA § 3500."

On the appeal ground (2) has been abandoned, and discussion as to ground (3) is unnecessary in view of our disposition of the appeal. The statement with which ground (3) was concerned, "Sonnett Exhibit A," is not one of the 43 documents in the so-called "Owen File."

[2]. The name of the attorney in charge of the prosecution was Richard Owen. The cover of the "Owen File" bore the name "Owen." The name was not written by Richard Owen but by another Government attorney who had charge of the files relating to this anti trust prosecution.

[3]. Trial counsel for defendants swear by affidavits submitted on the new trial motion that all the papers they received were machine numbered by the Government for purposes of filing. None of the papers contained in the Owen File was so numbered.

Telephone Company on the subject of discontinuance of New Sanitary's telephone service. This "telephone letter" was held in Mr. Owen's hand and referred to by him during his redirect examination of Ullman.[4] It is the only paper in the Owen File which the Government concedes it knowingly possessed during the trial.

On July 2, 1958, which was only slightly more than two weeks after the trial court found the defendants guilty, the Anti Trust Division showed the Owen File to Ullman, his lawyer and his accountant, who were preparing to bring a treble damage action against the defendants. At that date, and also on December 4, 1958, when the Anti Trust Division showed the Owen File to defense lawyers, the File contained the telephone letter used by Owen during the trial as well as the 42 documents which the appellants claim were illegally suppressed.

1. *Location of the Owen File and its contents during the trial.*

The brief of the United States contends that the movants for a new trial failed to prove that the Owen File was in the Government's possession during the trial. In his opinion denying the motion, Judge Palmieri said, App. 3386a:

"I find it impossible, on the basis of the affidavits before me, to make findings or to reach conclusions which would adequately explain the presence of these papers in the Government files at the time they were found. All that is clear is that sometime after the criminal trial was concluded, these papers were found, at different times, in the Government files which the parties to the civil case were permitted to inspect."

If these statements be regarded as findings of fact, this court is as well able as was the trial judge to pass upon the affidavits.[5] But in our opinion the trial court erred in a matter of law in failing to consider and apply the evidentiary principle that the subsequent existence of a fact supports the inference of its earlier existence, when the subsequent condition is one which ordinarily would not exist unless it had also existed at the earlier time. This principle is discussed in 2 Wigmore on Evidence (3rd ed.) 413–414, and we recently recognized it in Russell, Poling & Co. v. Conners Standard Marine Corp., 2 Cir., 252 F.2d 167, 170.[6] In the light of the fact that the Owen File was among Government files shortly after trial, it is a proper inference, absent any explanation of how it came to be there, that the Government had possession of it during the trial. Had this principle been applied, the trial judge would have found that the Owen File was in the Government's possession before the trial was concluded.

2. *The Owen File would have been useful to the defendants in their cross-examination of Ullman.*

The papers contained in the File consist of scattered correspondence in the years 1949 to 1951 as well as financial data and contracts of New Sanitary. The Government's brief contends that the documents in the file would have strengthened the case of the prosecution. The trial judge expressed the view that the movants "failed to prove that they were materially handicapped as a result of the absence of the papers,"[7] and that the documents would not have affected his determination of the defendants' guilt.[8] We disagree with the Government's contention and the trial court's conclusions. Ullman was a witness who at times not only contradicted his prior testimony but also was vague in his recollection of

---

**4.** By affidavit submitted on the new trial motion Mr. Owen states that he was not aware that this letter was an unnumbered document until after defendants moved for a new trial.

**5.** See Orvis v. Higgins, 2 Cir., 180 F.2d 537, 539, certiorari denied 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595; Seagrave

Corp. v. Mount, 6 Cir., 212 F.2d 389, 394; Besig v. United States, 9 Cir., 208 F.2d 142, 144.

**6.** See also United States v. S. B. Penick & Co., 2 Cir., 136 F.2d 413.

**7.** App. 3394a.

**8.** App. 3399a.

events which occurred years before. Some of the documents contained in the Owen File would have been of obvious benefit to the defense counsel in their cross-examination of Ullman. It will suffice, without detailed discussion, to refer to three matters as to which the trial court made specific findings based on Ullman's testimony. One was the 1950 strike at New Sanitary which the court found the defendants had either instigated or of which they had obtained advance notice.[9] Another was the extent of Ullman's investment in New Sanitary, and a third was New Sanitary's dealings with Howard Johnson restaurants. At the trial the defendants sought to show that Ullman had exaggerated the damage caused by the strike as well as his investment in and the profits of his New Sanitary business. Some of the documents in the File were highly relevant to the defendants' contentions. It is, of course, impossible to know whether the result of the trial would have been different if defense counsel had had the Owen documents. No one can tell what might have developed had the Government's principal witness been confronted with them during cross-examination, or if certain of the documents had been available to refresh his recollection about facts which he did not remember and which, if elicited, might have been helpful to the defendants. As stated in Clancy v. United States, 365 U.S. 312, 316, 81 S.Ct. 645, 648, 5 L.Ed.2d 574: "Since the production of at least some of the statements withheld was a right of the defense, it is not for us to speculate whether they could have been utilized effectively."

3. *Treating the motion as one alleging negligent suppression of evidence*

*are the defendants entitled to a new trial?*

■ The appellants do not contend that the suppression was wilful, i. e. knowingly done by the prosecution or other Government agents.[10] They do contend that it was negligent. The Government disputes that any negligence was proved. We think it was. Here the documents came into possession of the Anti Trust Division in connection with preparing the case for trial. Someone in the Government's employ so arranged them in the files that the prosecutor did not find them when he attempted to comply with the trial court's order to permit defense counsel to inspect all documents relating to Ullman's testimony. Having become custodian of them for its own benefit in this anti trust prosecution, we hold that it was the duty of the Government to keep the evidence of which it was custodian in such manner that it would be available for use upon the trial by all parties. This duty was breached by someone in the Government's employ. Through unexplained acts, certain of the papers in the Government's custody were misplaced and consequently were not shown to defendants when inspection was ordered. This failure to produce deprived the defendants of evidence which would have been helpful to them on points which the findings show were of great importance in determining their guilt. For practical purposes the Owen papers were temporarily lost. We hold this was negligence chargeable to the prosecution.

■ Although no authoritative case precisely in point has been called to our attention, the appellants' citations tend to support the conclusion that the negli-

9. App. 2578a.

10. Concededly, if the suppression were wilful, they would be entitled to relief. See Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217; Pyle v. State of Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214; United States v. Sobell, D.C.S.D.N.Y., 142 F. Supp. 515, 525, affirmed 2 Cir., 244 F.

2d 520, certiorari denied 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77, rehearing denied 355 U.S. 920, 78 S.Ct. 338, 2 L.Ed.2d 280. This principle does not cease to apply merely because the testimony goes only to the credibility of the witness. Napue v. People of State of Illinois, supra.

gent suppression of material evidence by the Government entitles a defendant to a new trial. In United States v. Heath, D.C.D.Hawaii, 147 F.Supp. 877, appeal dismissed 9 Cir., 260 F.2d 623 where documentary evidence relevant to the charges and necessary for defense was lost by Government agents, the district judge held that the indictment be dismissed. In Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, the court cited with approval a statement from People v. Savvides, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 855:

> "That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing as it did, a trial that could in any real sense be termed fair."

The Savvides case has been described as an example of a negligent suppression of evidence. See Comment, 32 N.Y.U. Law Rev. 607, 611. The Napue opinion also cites with approval United States ex rel. Montgomery v. Ragen, D.C.N.D. Ill., 86 F.Supp. 382 where the prosecution was charged with constructive knowledge of a doctor's report favorable to the accused, even though it was not in the State's custody. See also Curran v. State of Delaware, 3 Cir., 259 F.2d 707, 713. Whether the unfairness involved in a conviction under these circumstances, like that involved when evidence is deliberately suppressed, is so fundamental as to amount to a denial of due process of law we do not feel called upon to decide. Compare United States v. Heath, supra, and Curran v. State of Delaware, supra, with Woollomes v. Heinze, 9 Cir., 198 F.2d 577, 579, certiorari denied 340 U.S. 897, 71 S.Ct. 235, 95 L.Ed. 650, and Application of Landeros, D.C.D.N.J., 154 F.Supp. 183. As the Ninth Circuit noted in the course of its opinion dismissing the appeal in Heath, supra, "There is no necessity to reach the verge of a constitutional question." 260 F.2d at page 629. We are content to rest our decision on our conviction that the denial of a new trial here is inconsistent with the correct administration of criminal justice in the federal courts, which it is our duty as an appellate court to supervise. As we recently said in another context:

> "The prosecutor must be vigilant to see to it that full disclosure is made at trial of whatever may be in his possession which bears in any material degree on the charge for which a defendant is tried. In the long run it is more important that the government disclose the truth so that justice may be done than that some advantage might accrue to the prosecution toward ensuring a conviction."

United States v. Zborowski, 2 Cir., 271 F.2d 661, 668. Accordingly we hold that the judgments must be reversed and a new trial granted.

However, one defendant is not subject to retrial on the present indictment. On January 21, 1958 the trial judge permitted an amendment of the indictment to change the name of defendant "Standard Coat Apron & Linen Service, Inc." to "Standard Coat, Apron & Linen Service, Inc." The change consisted in inserting a comma after the word "Coat." Although the addition of the comma might superficially appear to be only a correction of a typographical error, the change actually substituted as a defendant a 1951 corporation for a dissolved 1941 corporation.[11] The substitution violated the rule laid down in Ex Parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L. Ed. 849 where the Supreme Court adopted the common law rule that an indictment cannot be amended by the court. This court followed the Bain decision in Dodge v. United States, 2 Cir., 258 F. 300, 7 A.L.R. 1510, certiorari denied 250 U.S. 660, 40 S.Ct. 10, 63 L.Ed. 1194. It is true that some circuits have held the rule

---

11. The corporation was dissolved for nonpayment of franchise taxes. This did not prevent it being subject to prosecution for federal criminal liabilities. See United States v. Indian Hill Farm, Inc., 2 Cir., 255 F.2d 282.

applicable only to amendments of substance and not amendments of form.[12] Such an exception is not here applicable. The substitution of one defendant for another cannot by any stretch of imagination be considered one of form only.

The defendants contend that the amendment rendered the indictment void as to all of them. No authority has been cited and we can see no reason for such a rule. There has been no suggestion that the others were prejudiced by the change. To upset their conviction on this ground would be a return to mere formalism. Compare Dodge v. United States, supra, holding that an amendment of two counts did not affect the right to try the defendant upon other counts of the indictment.

## II. THE CONVICTION APPEAL

Since we have directed a new trial, many of the questions raised by the appeal from the conviction and sentences need not be determined. Thus, there is no occasion to pass upon contentions attacking sufficiency of the evidence or alleging unfairness in the trial other than simply stating that there is no basis in these contentions for ordering acquittal. However, some of the questions presented either would require direction of a verdict of acquittal if decided favorably to appellants or are likely to arise upon retrial. As to the former, we will state briefly our reasons for rejecting them, and as to the latter an expression of our views may be helpful to the trial court.

1. The appellants contend that the interstate commerce requirements of sections 1 and 2 of the Sherman Act were not met, in that (1) there was insufficient proof of a conspiratorial restraint on the movement of *new linen* in interstate commerce; (2) there was insufficient proof of a conspiratorial restraint on the interstate movement of *linens to and from laundries;* and (3) there was insufficient proof of a conspiratorial restraint on interstate *cus-*

*tomer servicing.* If the alleged conspiracy aimed at restraint or monopolization in any of these three areas, and if the volume of interstate commerce that was affected was substantial, then it matters not "how local the operation which applies the squeeze." United States v. Women's Sportswear Mfg. Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805. We find it unnecessary here to discuss contentions (1) and (2) since we are convinced that a restraint on interstate customer servicing was established. If linen suppliers conspiratorially allocate their out-of-state customers to one of the conspirators such customer's range of choice and ability to seek out the supplier who could give him better terms is curtailed. Appellants seemingly rely on a *de minimis* exception; they argue that interstate customer service amounts to only 1% of all service. But (even accepting appellants' figures) such 1% amounted, in 1954, to $523,168 worth of business, a "volume of business * * * [which] cannot be said to be insignificant or insubstantial." International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20. That this substantial amount of interstate commerce amounted to only 1% of the total industry's volume is without significance.

2. Appellants attack their convictions under count 2 of the indictment. They argue that the prosecution failed to prove (a) a specific intent to monopolize, (b) a dangerous probability that monopolization would occur as a result of the conspiracy, and (c) the relevant market sought to be monopolized. As to point (a), it may well be doubted whether the evidence that the defendants agreed to protect old business by allocating customers would be sufficient, if standing alone, to prove a specific intent to monopolize rather than only an intent to restrain trade. But this evidence does not stand alone. Assuming the correct-

12. See Williams v. United States, 5 Cir., 179 F.2d 656, affirmed on other grounds, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774; United States v. Denny, 7 Cir., 165 F.2d 668, certiorari denied 333 U.S. 844, 68 S.Ct. 662, 92 L.Ed. 1127.

ness of Judge Palmieri's findings, the defendants took concerted action to drive independent non-cooperating linen suppliers out of business. In our opinion this was sufficient to support the conclusion that defendants had the specific intent to monopolize. Also promises made to independents that they could raise prices by joining the alleged conspiracy gave further support to this conclusion. As to point (b), it will suffice to say that no authority has been called to our attention which indicates that the Government must prove a dangerous probability that monopolization will result from such a conspiracy.[13] As to point (c), the charge here is conspiracy to monopolize, not monopolization. In a monopolization case the market must be proved. See International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed. 2d 270. This is because such a charge requires a showing of power to exclude competitors, and without an accurate delineation of the market, it is impossible to determine the presence or absence of this power. But where the charge is conspiracy to monopolize, the essential element is not the power, but the specific intent, to monopolize. Section 2 makes it unlawful "to conspire to monopolize 'any part' of interstate commerce, without specifying how large a part must be affected. Hence it is enough if some appreciable part of interstate commerce is the subject" of the conspiracy. United States v. Yellow Cab Co., 332 U.S. 218, 225–226, 67 S.Ct. 1560, 1564, 91 L.Ed. 2010. See Turner, Anti Trust Policy and the Cellophane Case, 70 Harv.L.Rev. 281, 294, 304–05.

3. Consolidated Laundries Corporation contends that it withdrew from the conspiracy prior to the five year limitation period prescribed by 18 U.S.C.A. § 3282, i. e. before January 31, 1952. It argues that the prosecutor's failure to connect it with any conspiratorial activities after that date would justify an inference of withdrawal. However, it is clear that a confederate, once shown to have been such, has the burden of satisfying the trier of fact that he had withdrawn from the enterprise. United States v. Cohen, 2 Cir., 145 F.2d 82, 90, certiorari denied 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637; United States v. Compagna, 2 Cir., 146 F.2d 524, 527, certiorari denied 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422. We cannot hold erroneous Judge Palmieri's conclusion that Consolidated had not carried this burden.

4. Consolidated also argues that it was improper for the trial court to impose sentence under the July 7, 1955 amendment to the Sherman Act, which increased the maximum permissible fine from $5,000 to $50,000. This contention is only a restatement of its argument, already discussed, that it had withdrawn from the conspiracy before January 31, 1952.

5. Appellant Radnitz also contends that the increased penalty provisions of the July 1955 amendment were inapplicable to him. His argument differs from that of Consolidated Laundries Corporation and rests on firm ground. In April 1955 he was arrested and arraigned upon an indictment making the very charges which were subsequently incorporated in the 1957 indictment upon which he was convicted. The 1957 indictment "superseded" a 1955 indictment in the Southern District of New York and a 1955 information filed in the District of New Jersey. That the arrest of a conspirator removes the presumption of continuing participation by him in the conspiracy is well established. United States v. Carminati, 2 Cir., 247 F.2d 640, certiorari denied 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113; United States v. Russano, 2 Cir., 257 F.2d 712, 715–716; Sandez v. United States, 9 Cir., 239 F.2d 239, 243; Cleaver v. United States, 10 Cir., 238 F.2d 766, 769. Unless the Government proves on retrial not only that

---

13. In American Tobacco Co. v. United States, 328 U.S. 781, 789, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575, the court said: "Petitioners, for example, might have been convicted here of a conspiracy to monopolize without ever having acquired the power to carry out the object of the conspiracy."

the conspiracy continued after July 7, 1955 but also that Radnitz continued his participation therein after his arrest in April 1955, the increased penalties provided by the amendment will be inapplicable to him. This applies not only to Radnitz but to other individual defendants, if any, who are shown to have been arrested on the 1955 indictment or information.

■ 6. All defendants contend that the trial court erred in refusing to apply the reasonable doubt test in ruling upon their motion for acquittal at the close of the Government's case. Judge Palmieri held that the applicable standard is whether he *could,* not whether he *would,* find the accused guilty on the Government's evidence. His opinion in support of the ruling appears as United States v. Cascade Linen Supply Corp., D.C., 160 F.Supp. 565. We agree with it.

■■ 7. Error is asserted in the trial court's denial to defendants of full access to the grand jury testimony of witnesses for the prosecution who testified at the trial. Judge Palmieri's opinion on this subject is reported in United States v. Consolidated Laundries Corporation, D.C., 159 F.Supp. 860. He held that defense counsel are not entitled to have the complete grand jury testimony turned over to them for use on cross-examination without prior scrutiny by the court. We agree with his opinion. See also the subsequent decisions of this Circuit in United States v. Giampa, 2 Cir., 1961, 290 F.2d 83; United States v. Hernandez, 2 Cir., 1961, 290 F.2d 86. In Giampa, which was also tried without a jury, we said that the correct procedure was for the trial judge to read the grand jury minutes and turn over to the defense any portions of a witness' testimony inconsistent with the story he told at the trial.

The grand jury testimony was referred to seven times during the trial to refresh the recollection of Government witnesses. As to these witnesses the appellants argue that they are entitled to receive the transcript of all their testimony before the grand jury. The argument is fallacious. See United States v. Socony Vacuum Oil Co., 310 U.S. 150, 233–234, 60 S.Ct. 811, 84 L.Ed. 1129. There the Court held that the trial judge has broad discretion to determine how much of the grand jury minutes need be made available when the minutes are used to refresh the recollection of a Government witness. In accord is Continental Baking Company v. United States, 6 Cir., 281 F.2d 137, 146–148. In that case, as here, the defendants did not request the trial court to exercise its discretion to turn over parts of the grand jury minutes, but demanded the minutes as a matter of right. The right they urged does not exist.

■■ 8. It is contended that the trial court erred in applying the *per se* rule to the restraints charged. It is true that section 1 of the Sherman Act proscribes only unreasonable restraints of trade. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619. But certain types of restraint of trade are unreasonable *per se, including territorial division of markets.* See Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545; Las Vegas Merchant Plumbers Ass'n v. United States, 9 Cir., 210 F.2d 732, 741, certiorari denied 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645; Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co., 4 Cir., 184 F.2d 552, 558, certiorari denied 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655; United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; United States v. National Lead Co., D.C. S.D.N.Y., 63 F.Supp. 513, 523, affirmed 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; but see Timken Roller Bearing Co. v. United States, 341 U.S. 593, 605, 71 S.Ct. 971, 95 L.Ed. 1199 (dissenting opinion); United States v. National Football League, D.C.E.D.Pa., 116 F. Supp. 319. Assuming that customers were allocated in the case at bar, no more need be proved; we agree that the *per se* rule should be applied. We fail to see any significant difference between an al-

location of customers and an allocation of territory. See United States v. American Linen Supply Co., D.C.N.D.Ill., 141 F.Supp. 105, 115. Suppose for illustration, that appellants had allocated the Bronx to Consolidated, Brooklyn to General, and Queens to Modern Silver, reserving the right to compete with each other in Manhattan. Clearly this hypothetical division of markets would be unreasonable *per se*, notwithstanding the open competition in Manhattan.[14] Similarly their agreement to suppress all competition as to one phase of their business, i. e., old customers, should be *per se* illegal irrespective of their competition for new customers. And when, as here, the allocation is coupled with predatory practices against independent linen suppliers in order to compel them to join the conspiracy or be put out of business, there is even more reason not to permit the conspirators to justify their activities on the ground that business expediency makes them reasonable.

9. Concerning the asserted erroneous admission of evidence relating to the so-called Ullman-Goldberg story, comment should be made only in general terms because the future trial judge will have to cope with these evidentiary problems in the light of the circumstances in which they may arise. However, the Ullman-Goldberg conversations played such an important part in the case and in the ultimate findings that some consideration should be given to the problems presented.

When the question of the admissibility of the Ullman-Goldberg conversations first arose, defense counsel objected on the ground of hearsay, claiming that there was no allegation "that Mr. Goldberg was in any way related with any of the defendants." To this, Government counsel replied, "That is right." Upon request of the trial court to explain how the Government intended to connect the conversation, counsel replied, "I expect the testimony of this witness to show

that Goldberg was initially believed by Messrs. Spatt, Radnitz, Gordon and Maslow, to be connected with New Sanitary, and they called him to a farm in Pennsylvania to talk to him about it. When they discovered he wasn't, they then made him their agent to keep sounding out the possibilities of Mr. Ullman selling out to them, * * *." The court then said, "What you say, in substance, is that you expect to establish that Goldberg was acting as the agent for the several defendants. On that basis, his testimony is admissible." 228(a), 229(a). The trial court refused to force the Government to indicate the manner in which it expected to connect Goldberg with the defendants, although defense counsel pointed out that, "If Mr. Goldberg were going to testify, Mr. Goldberg would be the one to testify before this witness." 230(a). Thereupon, Ullman proceeded to tell of his conversation with Goldberg wherein Goldberg had told him that he (Goldberg) had been contacted by the big fellows in New York from whom he (Ullman) was taking business and that it would be wise for Ullman to sell out to them. A second Ullman-Goldberg conversation took place in which Goldberg told Ullman that he had visited with the defendants who had accused him (Goldberg) of being the actual owner of New Sanitary and discussed with him the possibility of his acting as an emissary to try to get Ullman to agree to sell his business to them.

Goldberg told Ullman "that he was speaking in behalf of the four big companies that wanted me (Ullman) out of the business." 233(a). Later on, another conversation took place to the same effect. Subsequent to the New Sanitary strike in the Fall of 1951, Goldberg told Ullman "that as a result of the strike, the trailing and loss of a few large accounts he thought it advisable at this time to either straighten away with the big fellows or sell out to them." 249(a). Subsequently, the defendant Spatt told

14. Compare United States v. National Lead Co., supra (TAS and TP divided up the world except that both sold in South America).

Ullman that he had spoken to Goldberg and that he (Spatt) thought that Ullman intended to meet with the big fellows and sell his business to them. A meeting between Ullman, Spatt and Radnitz was held thereafter, at which negotiations for the sale of Ullman's business were commenced. At this point defense counsel moved to strike the testimony "on the ground that the alleged agency by Mr. Goldberg may not be proved by the statements of a witness of what the alleged agent told him." The trial court, however, ruled that Goldberg's agency had been sufficiently spelled out by Ullman's testimony "with respect to the statements attributed to any one of several of the defendants and by any number of surrounding facts and circumstances to which he has also testified." He, therefore, held that Goldberg's agency was not based upon "unsupported declarations of agency." 252(a).

 It is axiomatic that agency cannot be proved solely by declarations of the alleged agent, but must be established by independent proof. Schauffler v. Highway Truck Drivers & Helpers, 3 Cir., 1956, 230 F.2d 7, 10; McWhorter v. United States, 6 Cir., 1922, 281 F. 119; 4 Wigmore, Evidence, § 1078 (3rd Ed., 1940).

 The independent proof may be circumstantial, but it must be "substantial," Ong Way Jong v. United States, 9 Cir., 1957, 245 F.2d 392, 395, and not "too slight." United States v. Stromberg, 2 Cir., 1959, 268 F.2d 256, 267.

The trial court found that Goldberg "was used by them" (defendants Gordon, Spatt, Maslow and Radnitz) as an intermediary and agent in their contacts with Paul Ullman (Finding #47) and that Ullman's decision to sell New Sanitary was made only after being told by Goldberg "who is acting as agent for the said defendants" and that "he thought it advisable for Ullman either to 'straighten out with the big fellows or sell out to them'" (Finding #52).

No restatement need be made of the reasons for the hearsay exclusion rule. It is based upon the common experience that the most trustworthy evidence usually comes from the original source undiluted by hearsay repetition. Upon any new trial these precepts should be kept in mind. Goldberg may well have been an "intermediary" but his conversations with Ullman are admissible against the defendants, only if it be established that he was acting for and representing them. The other facts and circumstances may be sufficient to establish agency even though Goldberg's own declarations of his status to Ullman would not qualify under the law as establishing this status or Goldberg himself may testify. Because at this time there is no way of knowing what proof may be adduced upon any new trial, no guide other than the generalities set forth can be or should be set forth.

The judgments of conviction and sentence are reversed and the cause is remanded for further proceedings in conformity with the foregoing opinion.

### On Petition for Rehearing.

**PER CURIAM.**

 The United States of America, plaintiff-appellee herein, has petitioned *for a rehearing in order to clarify our opinion filed May 31, 1961.* The issue as to which clarification is sought is the applicability of the second sentence of Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. to the new trial ordered by this court.[1]

The case was tried to the court without a jury and all defendants were convicted. Fines aggregating a large sum were imposed and four individual defendants were given short prison sentences. Each defendant corporation and each individual defendant duly appealed from

---

1. The first two sentences of Rule 33 read as follows: "The court may grant a new trial to a defendant if required in the interest of justice. If trial was by the court without a jury the court may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment."

the judgment against it or him, and also from the denial of the subsequent motions for a new trial. Upon the latter appeal we held that a new trial was required in the interest of justice. Accordingly the judgments of conviction and sentence were reversed, a new trial was granted, and the cause was remanded for further proceedings in conformity with our opinion.

Our opinion contemplated a complete new trial. The defendants would be likely to be at a disadvantage if Judge Palmieri should merely take new evidence with respect to the contents of the Owen file, as he had expressed the view that what it contained would not have changed his conclusions as to the defendants' guilt. If any other district judge held the new trial, it is not apparent to us how he could usefully apply the abbreviated procedure provided by the second sentence of Rule 33.

It is not our understanding that Rule 33, applicable to a new trial granted by the trial judge, imposes any limitation upon an appellate court's power to direct a completely new trial in the interest of justice. Accordingly the petition for a rehearing is denied.