ANTHONY ROMANO and JOSEPHINE ROMANO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Romano v. Commissioner
Docket No. 9754-75.
United States Tax Court
T.C. Memo 1980-323; 1980 Tax Ct. Memo LEXIS 266; 40 T.C.M. (CCH) 1003; T.C.M. (RIA) 80323; August 18, 1980, Filed Sidney Meyers, for the petitioners. Larry Kars and Martha Sullivan, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined deficiencies in petitioners' Federal income tax and additions to the tax pursuant *267 to section 6653(a) [1] and 6653(b) as follows: Petitioner
Year
Deficiency
Additions to tax
Anthony Romano
1965
$ 9,984.00
$ 499.20 (sec. 6653(a))
Anthony Romano and
1968
130,268.98
65,134.49 (sec. 6653(b))
Josephine Romano
Concessions having been made, the issues which remain for decision are: (1) Whether the petitioner, Anthony Romano, received $30,000 in unreported gross income from Marathon Battery Company during the taxable year 1965; (2) Whether the petition, Anthony Romano, is liable for an addition to the tax for negligence for the year 1965 pursuant to section 6653(a); (3) Whether the petitioners received a taxable economic benefit in the amount of $38,000 from A.P. Stangl, Inc. during 1968; (4) Whether the petitioners omitted $172,000 in income from their 1968 tax return derived from the purchase and sale of an interest in Garden Village Builders, Inc.; (5) Whether the petitioner, Anthony Romano, is liable for an addition to the tax for fraud for the year 1968 *268 pursuant to section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife who resided in Danville, California, at the time the petition herein was filed. Petitioners did not file an income tax return for 1965. Petitioners filed a joint income tax return for 1968 with the District Director of Internal Revenue, New York, New York. Josephine Romano is a party to this proceeding solely by virtue of having filed a joint income tax return for 1968 with her husband and, consequently, Anthony Romano will hereinafter be referred to as petitioner. Respondent determined that no part of the alleged underpayment of tax was due to fraud on the part of Josephine Romano and agrees that the asserted addition to tax for 1968 does not apply to her. For the years in issue petitioner was in the business of investing in real estate. More accurately, however, he could be described as wheeler-dealer. In January 1965, petitioner received checks in the sum of $30,000 from the Marathon Battery Company. These checks were made payable to Anthony Caruso, an alias which petitioner was then using. The checks were deposited by petitioner *269 in his Wisconsin bank account under the name of Anthony Caruso. Petitioner met Alfred P. Stangl (Stangl) in June of 1968 through a business acquaintance, Pasquale D. Cipolla. Petitioner tried to persuade Stangl to invest in a lumber deal in Nicaragua. Stangl investigated, but determined that this would not be a suitable investment for him; however, during August and September 1968, petitioner received four checks totaling $33,000 from A.P. Stangl, Inc. (Stangl, Inc.), a general contracting firm owned by Stangl and Daniel L. Collins (Collins). These payments were reported on the books of Stangl, Inc. as "loans receivable." Partly in exchange for these payments petitioner was to provide Stangl, Inc. with information pertaining to the locations of planned New York State Throughway interchanges. Stangl, Inc. did not receive any such information nor did it receive any of the $33,000 back from the petitioner. Additionally, Stangl, Inc. sold two automobiles to petitioner in October and November 1968.The purchase price was $2,500 each. This $5,000 was reported on the books of Stangl, Inc. as a "receivable." Petitioner has never paid for these automobiles. In September 1968, Alfred *270 P. Stangl (Stangl) personally loaned petitioner $20,000. Petitioner had informed Stangl that he had to repay a loan to another, and that he was desperate. These funds also were never repaid to Stangl. During the summer of 1968 petitioner introduced Stangl to Howard N. Johnson (Johnson).Johnson sought to borrow money on a $186,000 paid-up, but restricted, life insurance policy. Petitioner had assisted Johnson in the acquisition of this and other life insurance policy received in exchange for an interest which Johnson held in a Daytona Beach, Florida motel. Stangl loaned Johnson $50,000 in exchange for approximately an $80,000 interest in the policy. In fact, Johnson's assignment of the policy was fraudulent as the premium was never paid. During 1968 and 1969 Stangl pursued Johnson in an effort to have his losses recouped. Ultimately he did acquire a judgment against Johnson for $80,000. In the meantime, on September 23, 1968, petitioner purchased Stangl's one-sixth interest in certain real estate located in New York State and Stangl's one-sixth interest in the stock of an apartment complex known as Garden Village Builders, Inc. (The land and the stock together shall hereinafter *271 be referred to as Garden Village.) The consideration to be provided by petitioner was his alleged interest in the stock of Trustco, Inc., and leases of a hotel and casino in Santa Domingo. This agreement was written on stationery bearing the name Lyndaunick Investments, Ltd., a Florida corporation wholly owned by Johnson. On September 24, 1968, petitioner purchased another one-sixth of Garden Village from Collins. The consideration for this transaction was petitioner's purported interest in Johnson's $186,000 life insurance policy. Almost immediately Stangl and Collins conveyed their respective one-sixth interests to petitioner.They received none of the promised consideration at that time.
On October 21, 1968, Stangl met with petitioner and Johnson in Fort Lauderdale, Florida, and received 10,000 shares of Comutrix Corporation (Comutrix) stock from petitioner. This stock was in substitution for the promised Trustco stock. This Comutrix stock was non-negotiable and, as such, worthless to Stangl. In an attempt to receive some value for this transaction, Stangl accepted 10,000 shares of Photo Mark Computer Corp. (Photomark) stock in February or March 1969, in exchange for the Comutrix *272 stock. On November 10, 1968, Collins agreed to the substitution of 11,000 shares of Comutrix stock, 5,000 shares of stock in Transcoastal Industries, Corp. (Transcoastal), and a promise for 5,000 more shares of Transcoastal in exchange for the interest in the life insurance on Johnson. Collins received these securities from Johnson in Daytona Beach, Florida; however, the receipt made out by Johnson indicated that the stock was being received from petition. On January 22, 1969, Collins agreed to accept 4,000 shares of stock in Photomark in exchange for the Transcoastal stock which he had received, and he released his claim for the additional 5,000 shares. He also received 2,000 shares of Photomark stock in payment of monies due A.P. Stangl, Inc. for "loans" advanced by it. In February or March 1969, collins agreed to accept 10,000 shares of Photomark stock in exchange for the Comutrix stock which he had been given. Thus, by April 1, 1969, in exchange for their interests in Garden Village, Stangl and Collins each held only 10,000 shares of Photomark stock. No prices were bid for the Photomark stock on the dates when it was transferred to Collins, Stangl and Stangl, inc. On *273 June 19, 1969, the Securities and Exchange Commission (SEC) filed an action in the United States District Court for the Southern District of New York seeking to enjoin petitioner and others from further violations of the registration and anti-fraud provisions of the Federal securities laws in connection with the sale of Photomark stock. It also suspended trading at that time noting that: "There can be no assurance that Photo Mark has any substantial assets, or shareholders' equity." (Securities Exchange Act of 1934, Release No. 8631 (June 19, 1969).) On September 25, 1968, petitioner informed the majority owners of Garden Village, Peter Santin, John Ogiony and Edward Ogiony (hereinafter referred to as the Santin-Ogiony group), that he was their new partner. The Santin-Ogiony group agreed to purchase petitioner's one-third interest in Garden Village for $175,000, to be paid $65,000 cash upon delivery of the deeds and the balance within 30 days thereafter. The $65,000 was paid petitioner on September 27, 1968, in the form of $25,000 cash and two cashier's checks for $20,000 each payable to Johnson with petitioner as remitter. One $20,000 check was endorsed over to Johnson by petitioner *274 as reimbursement for expenses incurred in relation to another transaction.The remaining payments on the contract between petitioner and the Santin-Ogiony group were made to petitioner partly by check and partly in cash. On August 16, 1971, petitioner was indicted in the United States District Court, Southern District of New York, on a two-count indictment. Count one charged him with willful evasion of income taxes for the year 1968 in violation of section 7201; count two charged him with willfully making false statements on his 1968 tax return in violation of section 7206(1). On January 20, 1972, petitioner pled guilty to count two of the indictment; count one was dismissed. Petitioner has not reported income from any of the above transactions. Respondent has determined that the $30,000 received by petitioner in 1965 from the Marathon Battery Company was income to him for that year and that he was negligent in his failure to report it. Respondent also maintains that petitioner did not repay nor did he intend to repay the $38,000 he received from Stangl,Inc. during 1968, thus the full amount is income to him for 1968. Respondent has further determined that since petitioner *275 purchased a one-third interest in Garden Village for no consideration, the entire proceeds from the sale of that one-third interest constitutes income. Finally, respondent alleges that petitioner's failure to report the 1968 income on his tax return for that year was willful and fraudulent. OPINION 1965 Receipts
Petitioner concedes that the $30,000 received from the Marathon Battery Company in 1965 was income to him. Petitioner, however, maintains that he experienced offsetting losses of $25,000 in 1965. Not a shred of evidence has been offered to substantiate nor even explain petitioner's claim of losses in 1965. Petitioner must satisfy his burden of proof that he is entitled to the loss deduction. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court rules of Practice and Procedure. This, the petitioner has plainly failed to do. Respondent has also determined that petitioner's failure to file a Federal income tax return for 1965 was due to his negligence or his intentional disregard of rules and regulations and has assessed a five-percent addition to tax pursuant to section 6653(a). Once again, petitioner has the burden of proving that *276 respondent's imposition of the section 6653(a) penalty is erroneous. Johnson v. Commissioner, 74 T.C. 89 (1980); Bixby v. Commissioner, 58 T.C. 757 (1972). Because petitioner has failed to satisfy his burden, the addition to tax under section 6653(a) is also sustained. 1968 Loans
Respondent maintains that $33,000 received by petitioner from Stangl, Inc. in 1968 and the two automobiles valued at $5,000 constitute income to petitioner for that year. Petitioner maintains that these payments represent loans which he intended to repay. Petitioner has the burden of proving that respondent's determination was incorrect. Welch v. Helvering, supra; Rule 142(a), Tax Court Rules of Practice and Procedure. For the reasons set forth below we find that petitioner has failed to meet his burden. The only evidence offered by petitioner in support of his contention is that the books of Stangl, Inc. reported these amounts as receivables. [2] The manner in which Stangl, Inc. characterized the payment is not controlling.The crux of the issue is whether or not petitioner intended to repay the monies at the time he received them. Stangl himself *277 testified that the payments were, at least in part, compensation for promised information on planned New York State Throughway interchange sites. More important, perhaps, is that petitioner has never repaid Stangl, Inc. This, coupled with the fact that petitioner never repaid Stangl the $20,000 personal loan [3] made in 1968, and the swindle of Stangl in relation to the Garden Village transaction, indicates a pattern that petitioner never intended to repay these monies. This being the case, the economic benefits to the petitioner in the form of $33,000 in cash and $5,000, the value of the two automobiles, are taxable to petitioner for 1968. See James v. United States,366 U.S. 213 (1961). See also United States v. Rosenthal,454 F. 2d 1252 (2d Cir. 1972). *278 Having found that the entire $38,000 is income to petitioner for 1968, we need not determine to what extent, if any, these payments represent prepaid compensation for the New York State Throughway information. Garden Village Transaction
In reference to petitioner's acquisition and sale of the one-third interest in Garden Village, he maintains that he acted solely in the capacity as agent for Johnson. Respondent, however, asserts that the petitioner was in fact the principal in the scam. Again, the burden of proof rests squarely on the petitioner. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. At trial petitioner's and Johnson's testimonies were in direct conflict.The petitioner continually asserted that he acted for Johnson. He testified, inter alia: that Johnson was present during the preparation of documents relating to the purchase of Stangl's interest in Garden Village; that this document was prepared on stationery of Lyndaunick which was Johnson's corporation; that Johnson participated in the preparation of documents relating to the purchase of Collins' interest in Garden Village; that Johnson's *279 insurance policy was the consideration for Collins' interest; that Stangl and Collins went to Johnson in an effort to receive consideration under the sale of their interest; that Johnson received one of the checks for $20,000 from the sale of the one-third interest in Garden Village to the Santin-Ogiony group; that Johnson negotiated the Garden Village purchases from both Stangl and Collins; that petitioner received only $1,500 from Johnson as a commission for helping Johnson acquire the Garden Village interest; and that Johnson signed a statement that petitioner was his agent in the Garden Village transactions. [4] Johnson, on the other hand, testified that his involvement in the preparation of Stangl's and Collins' agreements to sell their respective Garden Village interests to petitioner was merely due to his legal experience from having served in the Kentucky Senate; that the Lyndaunick stationery used in the Stangl agreement was scrap paper, since that corporation had since changed its address; that he did not negotiate the purchase of Garden Village; that he was not present at the conveyances of Garden Village to petitioner; that the $20,000 check received represented expenses *280 due him from an unrelated transaction; that he did not write or sign the purported statement of agency; and that he was not a principal in the Garden Village acquisition from Stangl and Collins. There is little doubt that both petitioner and Johnson were intimately involved in the scheme to defraud Stangl and Collins. Johnson's role, however, is not entirely clear. At the time of trial Johnson was involved in litigation before this Court. It was in the best interest of each that the tax consequences of their scheme attached to the other. The most reliable and credible evidence presented is the testimony of Stangl and Ogiony and the stipulated documentary evidence, namely the contracts between petitioner and Stangl, between petitioner and Collins, and between petitioner and the Santin-Ogiony group. Stangl testified that petitioner indicated his personal desire to purchase Stangl's interest; that petitioner negotiated the terms of the purchase; and that his only business dealings with Johnson *281 related to the $50,000 loan against his insurance policy. John Ogiony testified that petitioner told him he was Ogiony's new partner; that petitioner offered to sell him the one-third interest in Garden Village; that the purchase negotiations did not include Johnson; that it was petitioner who insisted on cash payment; and that all monies paid on the purchase of petitioner's one-third interest in Garden Village were paid to petitioner or delivered to him through Cipolla. Finally, in the stipulated purchase agreement entered into between petitioner and both Collins and Stangl, petitioner alone was the named buyer and he admits that he signed as such. Similarly, in the stipulated agreement of sale between petitioner and the Santin-Ogiony group, the petitioner was the only named seller and he signed as such. Whatever Johnson's role in the Garden Village "charade," we cannot find, based on the evidence presented, that he was a principal while the petitioner was merely his agent. On the contrary, the weight of evidence supports the conclusion that petitioner acted on his own behalf. Moreover, it is a well-established priciple of the law of agency that one may not establish himself *282 as agent of another solely on the basis of his own self-serving testimony.See United States v. Consolidated Laundries Corp., 291 F. 2d 563 (2d Cir. 1961); Tarstar Shipping Co. v. Century Shipline, Ltd., 451 F. Supp. 317 (S.D.N.Y. 1978), affd. without discussion of this point 597 F. 2d 837 (2d Cir. 1979). In Consolidated Laundries Corp. the Second Circuit left no room for equivocation when it stated (291 F. 2d at 576): It is axiomatic that agency cannot be proved solely by declarations of the alleged agent, but must be established by independent proof. * * * Inasmuch as petitioner has presented no evidence other than his uncorroborated testimony that he was Johnson's agent, and in addition to the incredulous nature of that testimony, there is insufficient proof that a principal and agent relationship existed between Johnson and the petitioner. Respondent characterizes the point in time at which petitioner realized income to be when he sold his fraudulently acquired interest in Garden Village to the Santin-Ogiony group. Under the facts, this is plainly in error. It is well established that income, whether lawfully *283 or unlawfully obtained and regardless of the possibility that it may have to be repaid, must be reported as gross income in the year received. James v. United States, 366 U.S. 213 (1961). Petitioner reaped the benefit of his swindle at the time he received the one-third interest in Garden Village from Stangl and Collins, September 23 and 24, 1968, respectively. It is clear from the facts that petitioner did con Stangl and Collins. Petitioner never owned an interest in Johnson's insurance policy or any Trustco stock, the promised consideration in the initial purchase contracts. He then substituted non-negotiable Comutrix stock as consideration. Finally, he again made a substitution this time of Photomark stock. No prices were bid for that stock when delivered to Stangl and Collins. Whatever trading there was of Photomark was soon suspended by the SEC, which then filed suit against petitioner and others to enjoin their further violation of the anti-fraud provisions of the Federal securities laws in connection with the sale of Photomark stock. Furthermore there is doubt as to whether petitioner actually owned the Photomark stock transferred to Stangl and Collins. *284 These actions on the part of petitioner clearly indicate his intent, ab initio, to obtain a one-third interest in Garden Village by fraud on September 23, 1968. Since petitioner sold his one-third interest in Garden Village to the Santin-Ogiony group on September 27, 1968, only three days after he acquired it, respondent maintains that the sale price represents the value of the one-third interest received by petitioner on September 23, 1968. Respondent has determined this amount to be $172,000. Once again, it is incumbent upon petitioner to show that this determination is erroneous. Welch v. Helvering, supra; Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner has submitted no evidence whatsoever to rebut the presumption that respondent's determination is correct. Therefore, we sustain the respondent's finding that petitioner received $172,000 of income from the Garden Village scam for 1968. See Phila. Pk. Amusement Co. v. United States, 130 Ct. Cl. 166, 126 F. Supp. 184 (1954). The recognition of $172,000 of income by petitioner on the acquisition of the one-third Garden Village interest increased his basis therein by *285 and to that amount. It's as if petitioner's fraud yielded cash which in turn was used to purchase the one-third interest in Garden Village. His basis in the Garden Village interest would then be its cost. Sec. 1012. Thus, on the subsequent sale to the Santin-Ogiony group for $172,000, petitioner recognized no gain or loss.
Fraud Penalty under Section 6653(b)
The final issue to which we must address ourselves is whether petitioner is liable for additions to tax for fraud under section 6653(b) for the year 1968. The existence of fraud is a question of fact to be decided upon review of the entire record. Stratton v. Commissioner, 54 T.C. 255 (1970). The burden to prove fraud rests upon the respondent (section 7454(a)) to be established by clear and convincing proof. Marcus v. Commissioner, 70 T.C. 562 (1978); Rule 142(b), Tax Court Rules of Practice and Procedure.
To prove fraud respondent must demonstrate that petitioner acted with specific intent to evade tax believed to be owing. Brountas v. Commissioner, 73 T.C. 491 (1979). Respondent, however, is not required to prove the precise amount of the underpayment resulting *286 from fraud, but only that "any part" of the underpayment was attributable to fraud. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969).Respondent's burden may be satisfied by circumstantial evidence. Stone v. Commissioner, 56 T.C. 213 (1971). Upon the record as a whole we conclude that respondent has met his burden of proof by clear and convincing evidence. First, petitioner's substantial under-reporting of income for 1965 and 1968 show a consistent patern which we consider persuasive evidence of fraud. Holland v. United States, 348 U.S. 121, 139 (1954). The size of the discrepancies between petitioner's actual and reported income for 1968--$210,000--as well as his failure to keep regular books or records for 1968 are also evidence of fraud. Petitioner engaged in a well-planned scheme to defraud Stangl and Collins. It caused him to personally receive well over $100,000 in cash without so much as a dollar of it reported on his 1968 tax return, despite an admission that he received at least $1,500 on the transaction as a commission. Alone, any one of the above indicia may not be sufficient to establish fraud, however, taken as *287 a whole respondent has produced a very strong case. Accordingly, we find that at least part of petitioner's underpayment for 1968 was due to fraud. Thus, we sustain the addition to tax under section 6653(b). Relying on Goodwin v. Commissioner, 73 T.C. 215 (1979), and Considine v. Commissioner, 68 T.C. 52 (1977), respondent maintains that, on the basis of collateral estoppel, petitioner's guilty plea under section 7206(1) for willfully making false statements on his 1968 Federal income tax return satisfies respondent's burden of proof as to petitioner's fraudulent intent under section 6653(b). While this may be true, we need not and do not decide that issue here. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
2. Petitioner apparently changed his mind during the trial and stated that the money received from Stangl was actually an investment in one of petitioner's business deals which subsequently failed.Stangl's testimony directly contradicted this position. Petitioner has offered no evidence to support his allegation, thus we do not accept it as true.↩
3. Respondent has advanced no contention that this $20,000 loan to petitioner was income to him in 1968, even though the evidence indicates that there was no intent on the part of the petitioner to repay it.↩
4. This statement, which is Exhibit 6, in fact authorizes petitioner to act as agent only on "Comutrix stock dealings derived out of the proceeds of the sale of Garden Village."↩