**UNITED STATES of America**

v.

**PENNSYLVANIA REFUSE REMOVAL ASSOCIATION, Harry Coren, Arnold Graf, Salvatore Graziano, and Edwin S. Vile.**

Crim. No. 21558.

United States District Court
E. D. Pennsylvania.

June 15, 1965.

Raymond D. Cauley, Carl J. Melone, Warren Marcus, Dept. of Justice, Antitrust Div., Philadelphia, Pa., for plaintiff.

Stanley M. Greenberg, Greenberg, Poserina & Sagot, Philadelphia, Pa., for defendants.

LUONGO, District Judge.

Defendants, Pennsylvania Refuse Removal Association, Harry Coren, Arnold Graf, Salvatore Graziano and Edwin S. Vile, were found guilty by a jury on a one count indictment charging them with violating the Sherman Anti-Trust Act (15 U.S.C.A. § 1).[1] Their motions for acquittal and for new trial are before me. The motions will be denied.

The Pennsylvania Refuse Removal Association is an organization made up of refuse removers in the Greater Philadelphia area. The Association was formed in 1960 as a vehicle through which area refuse removers could better deal with problems that were of common interest. Originally the Association was called Delaware Valley Refuse Removal Association, but by 1962 it had merged with a similar group with headquarters in South Philadelphia and adopted its present name. Defendants Graf, Graziano and Vile were officers and/or directors of the Association virtually from its inception in 1960 and continuing throughout the period covered by the indictment.[2] Defendant Coren occupied a similar position beginning in early 1962 when the South Philadelphia group, of which he was a member, merged with Delaware Valley.

---

1. "§ 1 * * *

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *."

2. The indictment covers the period beginning with 1960 and ending October 30, 1963.

At the trial of the case, the government introduced evidence to show that members of the Association, including the defendants, agreed to fix prices, allocate customers and rig bids in the refuse removal business in the Greater Philadelphia area, practices proscribed by § 1 of the Sherman Anti-Trust Act. Defendants' evidence tended either to contradict the government's evidence or to explain and to shed a different light on it. The jury accepted the government's version of the evidence and found the defendants guilty.

In their brief, defendants allege many trial errors, but defendants' counsel frankly conceded at oral argument that none warrant either new trial or acquittal except those · pertaining to the question of whether the interstate commerce requirement of the Sherman Anti-Trust Act was satisfied. Notwithstanding counsel's candid concession, I have considered all of defendants' contentions and have concluded that they are unfounded. Only those relating to interstate commerce warrant discussion.

(a) *Scope of Defendants' Business.*

The real thrust of defendants' argument regarding interstate commerce is that the refuse removal here was a purely local operation; that the service is complete when trash or garbage is removed from a customer's premises and deposited in the remover's vehicle; and since virtually all of the customers in the instant case were located in Pennsylvania, there has been no showing of the requisite interstate commerce for the application of the Sherman Anti-Trust Act.

■ As stated in Las Vegas Merchant Plumbers Ass'n v. United States, 210 F. 2d 732, 739 n. 3 (9th Cir. 1954), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L. Ed. 645 (1954).

"A case under the antitrust laws, so far as the interstate commerce element is concerned may rest on one or both of two theories:

"(1) That the acts complained of, occurred within the flow of interstate commerce. This is generally referred to as the 'in commerce' theory.

"(2) That the acts complained of, occurred wholly on the state or local level, in intrastate commerce, but substantially *affected* interstate commerce." (Italics in the original.)

■ This case was presented on the "in commerce" theory. Whether the refuse removal business was "in commerce" depended upon the scope of the business. It was the court's function to define the scope of the business under the facts and circumstances present in the record. United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Here the court determined that the scope of that business encompassed not only the collection of refuse, but also the carrying away and disposal of it. In the refuse removal business, collection and disposal are inseparable. Witness after witness testified that their refuse trucks are emptied as soon as possible after they are filled and in no event longer than 24 hours after collection. The reason for this is obvious. A filled truck is a liability to the operator of a refuse removal business, an empty truck is an asset, essential to the performance of further service. Indeed, the more modern refuse removal equipment is designed to reduce the number of trips to the place of disposal by compacting greater quantities of the collected refuse into the cargo carrying portion of the vehicle. Under these circumstances it would have been totally unrealistic for the court to separate the collection and the disposal functions. Each is essential to the conduct of the business in which the defendants are engaged.

(b) *Defendants' Activities "In Interstate Commerce."*

■■ If the court was correct, therefore, in defining the refuse removal business as including both collection and disposal, the government clearly sustained its burden of showing that defendants' business was "in interstate commerce" as that term is defined in Las Vegas

Merchant Plumbers Ass'n v. United States, supra. There was testimony from fifteen witnesses[3] that during the period covered by the indictment each had collected refuse in Pennsylvania and each, with varying degrees of regularity, dumped substantial quantities of it in New Jersey. By way of illustration:

James Anthony, owner of a large Pennsylvania refuse removal company, testified that in the spring of 1962 his company dumped in New Jersey 50 loads of trash collected in Pennsylvania.

Matthew Brimmeier testified that during the period from 1961 through the first ten months of 1963, his company dumped approximately 10% of the refuse it picked up in Pennsylvania at a New Jersey landfill. In 1960 the amount was somewhat less—from 5% to 7%. Mr. Brimmeier noted that this amounted to about one load per day being dumped in New Jersey out of a possible six loads to be dumped.

Thomas McCarthy, also a Pennsylvania refuse remover, testified that while he did not dump anything in New Jersey in the years 1960–61, he did dump Pennsylvania-collected refuse in New Jersey in 1962 and during the first ten months of 1963. He testified that in 1962 he paid dumping costs of $5,460 of which $644 went to New Jersey landfills as payment for dumping refuse collected in Pennsylvania.

The testimony from the other twelve witnesses was along similar lines and amply supported the government's burden to establish that defendants' activities were within the flow of interstate commerce.

(c) *Effect of the Defendants' Activities on Interstate Commerce.*

Defendants contend that the government did not establish that their activities had an effect on interstate commerce. One aspect of that argument is intertwined with their contention that theirs was a purely local activity which terminated when the trash was deposited in their trucks. The court's definition of the scope of the removal business ruled that out.

The other aspect of the defendants' argument is that, assuming that their business is "in commerce," it was nevertheless incumbent upon the government to establish that their activity had an effect upon interstate commerce. But agreements to fix prices, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 & n. 59 at p. 224–226, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); to allocate customers,[4] United States v. Consolidated Laundries, 291 F.2d 563, 574 (2d Cir. 1961); and to rig bids, Addyston Pipe

---

3. This number includes mainly Pennsylvania removers who collected refuse in Pennsylvania and dumped it in New Jersey. It also includes a few New Jersey removers who came into Pennsylvania, picked up refuse and returned to New Jersey to dump it. Defendants contend that the latter were eliminated from consideration by the court insofar as their actions had any bearing on interstate commerce. This is only partly true. The court made it clear that the jury would not be allowed to consider the fact that haulers living in New Jersey came into Pennsylvania to pick up refuse as sufficient to establish interstate commerce. However, the jury was perfectly free to consider the New Jersey removers as being a part of interstate commerce when it became apparent that those removers were dumping in New Jersey the refuse that they had picked up in Pennsylvania.

4. Defendants make a rather peculiar statement that while there was no evidence showing a conspiracy to allocate customers, there was some vague testimony that there was a conspiracy to have members of the Association refrain from competing for customers who were already being serviced by other Association members. See Defendants' Brief, p. 73–74 and footnote therein. This is a distinction without a difference. "[An] * * * agreement to suppress all competition as to one phase of their business, i. e., old customers, should be *per se* illegal irrespective of their competition for new customers." United States v. Consolidated Laundries Corp., supra, 291 F. 2d p. 575. See also United States v. American Linen Supply Co., 141 F.Supp. 105, 115 (N.D.Ill.1956).

& Steel Co. v. United States, 175 U.S. 211, 235–245, 20 S.Ct. 96, 44 L.Ed. 136 (1899), are per se violations of the Sherman Anti-Trust Act and where such proscribed acts occur within the flow of interstate commerce, the government is relieved of the burden to show an effect upon interstate commerce. In such cases it is sufficient for the government to establish that the agreements were made; the effect upon interstate commerce is presumed. Las Vegas Merchant Plumbers Ass'n v. United States, supra, 210 F. 2d p. 748–749; Plymouth Dealers Ass'n v. United States, 279 F.2d 128, 130–131 (9th Cir. 1960). See also Associated Press v. United States, 326 U.S. 1, 11–13, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

(d) *Sufficiency of Evidence of Per Se Illegal Agreements.*

■■ Defendants contend that there was no evidence of per se violations. Viewing the evidence, as we must, in the light most favorable to the government, United States v. Nedley, 255 F.2d 350, 352 (3d Cir. 1958), there was ample support for the jury's finding that the defendants engaged in the proscribed agreements to fix prices, allocate customers and rig bids. A few samples of testimony will suffice to demonstrate that sufficiency.

As to price fixing, Thomas McCarthy testified that at an Association meeting in December 1962, defendant Graziano recommended to the membership that prices for refuse removal be raised by between 25% and 50%, effective January 1963. According to McCarthy, the membership, including all the defendants, expressed agreement by raising their hands.

In this same regard another witness, Michael Schiavo, testified that at a meeting in his office in August or September 1962, attended by defendants Graf, Graziano and Vile, Graziano, when asked what the purpose of the Association was, stated that it was " * * * being formed to fix prices in our industry * * *." (N.T. 1119).

As for allocation of customers, James Anthony, an Association member, testified that at a membership meeting in 1962, defendant Graziano proposed that one member should not take a customer of another member and that if he did he would either have to give the stop back or make amends either by a money payment or by giving up equivalent work. Anthony further testified that defendants Graf, Graziano, Vile and Coren all signified their agreement with this proposal by raising their hands.

Similarly, Robert Allen, a Pennsylvania refuse remover, testified that he went to a meeting of the Association because he was losing accounts in an area known as Hartsville Park. Defendant Graf assured him that if he (Allen) joined the Association he would lose no more business. Allen joined but continued to lose accounts, especially to one Donald Shindlar, an Association member. Allen informed Graf of his continuing misfortune whereupon Graf arranged to meet with Allen, Shindlar, and Shindlar's driver. The meeting took place in Graf's car in Hartsville Park. The four men drove around and Allen pointed out to them the stops he had lost to Shindlar, both before and after becoming a member of the Association. Graf then instructed Shindlar to give back to Allen those stops taken from him after he became a member, but that he could keep those he had acquired before Allen joined the Association.

In the area of rigging bids, there was testimony by Thomas McCarthy that at a meeting in 1962, defendant Graziano told the membership " * * * that if a brother member was hauling a stop and three or four other members had received the bid, that they should get in touch with the member that is hauling the stop and find out what he is bidding and bid higher, so that the member could keep the stop." (N.T. 503). Present when this statement was made were the other defendants, Graf, Vile and Coren.

Finally there was testimony from Daniel Albert, a refuse remover, that in 1962 at the request of defendant Vile

he submitted a prearranged bid to the Neshaminy School District which resulted in the award of the contract to Vile. In return, Vile permitted Albert to service two of the stops and paid him a specified sum per month for servicing them.

(e) *Instructions on Interstate Commerce.*

██ Defendants also assign as a ground for new trial that a portion of the court's charge relating to interstate commerce was erroneous in that it directed the jury to find that the government had established the requisite interstate commerce. That argument is based upon an isolated sentence taken out of context.[5] It is clear from the instructions as a whole, and particularly that which immediately preceded and followed the questioned sentence, that the court left it to the jury to determine whether the government had established that the defendants' business involved interstate commerce. If there was error in the instructions, it was favorable to the defendants since under the definition of the scope of the refuse removal business given to the jury, the court would have been justified in instructing the jury that the requisite interstate commerce

had been established if they believed that *any* amount of trash moved across state lines, provided, of course, that they were satisfied beyond a reasonable doubt that the defendants had agreed to fix prices, allocate customers, and rig bids. United States v. Columbia Steel Co., 334 U.S. 495, 521–523, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); United States v. Yellow Cab Co., supra, 332 U.S. p. 225, 67 S.Ct. 1560, 91 L.Ed. 2010.

(f) *Subject of "Trade or Commerce."*

██ Finally, defendants argue at various points in their brief, that because trash itself is by definition a worthless commodity, it cannot be the subject of "trade or commerce" as those terms are used in the Sherman Act. That argument misses the point. Here, the real subject of "trade or commerce" was not worthless debris, but the valuable service of removing and disposing of it.[6] Since services are encompassed within the meaning of the words "trade or commerce" as used in the Act, United States v. Nat'l Ass'n of Real Estate Boards, 339 U.S. 485, 488–492, 70 S.Ct. 711, 94 L.Ed. 1007 (1950), the defendants' position has no merit.

Defendants' motions for new trial and for acquittal will be denied.

---

5. "There was also some objection taken to the manner in which I left the interstate aspect of this case.

"I said to you that if you find that refuse removers pick up trash in Pennsylvania and haul an appreciable quantity of it to New Jersey, then you may find that the interstate aspect of the crime has been satisfied. I recognize that 'appreciable' is a very vague term.

"I then went on to say to you that you are to consider that as opposed to, as I think I used the expression, a casual load or two taken over to New Jersey. All I mean to convey to you, members of the jury, is that there was a sufficient movement of such trash from Pennsylvania to New Jersey that it could not be characterized as something that was

just casual or inadvertent.*

"If you find that this was a part of a regular and consistent movement of trash from Pennsylvania to New Jersey, if you find that was part of the business of removing trash from Philadelphia area by these refuse collectors who operate in the Philadelphia area, then I say to you that the interstate commerce aspect of the crime has been established." (N.T. 2204–05)

* It is the sentence immediately preceding the asterisk that the defendants contend directed the jury's finding.

6. As an example, one refuse remover, Michael Schiavo, testified that his company grossed between $450,000–$500,000 per year in the refuse removal business.