**COMPACT, et al., Plaintiffs,**

v.

**The METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY, TN., et al., Defendants.**

**No. 3–84–0853.**

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 18, 1984.

Avon N. Williams, Jr., Williams & Dinkins, Russell T. Perkins, Nashville, Tenn., for plaintiffs.

Jack Robinson, Joel Leeman, Gullett, Sanford & Robinson, Nashville, Tenn., for defendants Gresham, Smith & Partners.

George E. Barrett, Barrett & Ray, Nashville, Tenn., for defendants Williams, Russell & Johnson.

Barry L. Howard, Wade B. Cowan, Gracey, Maddin, Cowan & Bird, Susan Emery McGannon, Donelson, Stokes & Bartholomew, P.A., Samuel W. Bartholomew, Nashville, Tenn., for defendants Metro Nashville Airport Authority and its members Mathews, DeWitt, Miller, Lanier, Gorrell, Wilt, Wilson, Fulghum and Moore.

William F. Howard, Deputy Director, Donald W. Jones, Nashville, Tenn., for defendants Metropolitan Government of Nashville & Davidson County and Fulton.

James D. Luther, Nashville, Tenn., for defendants Metro Bd. of Educ. and its members Weeks, Gupton, Bentrup, Branstetter, Northern, Lambert, Hightower, Gann, Denney, Frazier and Wise.

Peter H. Curry, Boult, Cummings, Conners & Berry, Nashville, Tenn., for defendant Hart-Freeland-Roberts.

## MEMORANDUM

WISEMAN, Chief Judge.

The present case examines the limits of lawful commercial conduct by minority businessmen in seeking meaningful participation in contracts for the construction of large government projects. This Court must decide whether all black architectural firms in a particular geographic area, who claim to have consistently been denied all but token shares on public works, may unite in a "joint venture" to demand partic-

ipation as a group, refusing to deal with prime contractors in their individual capacities but only on the terms negotiated exclusively by the coalition. This Court concludes that such concerted action, despite its compelling motive to overcome racial discrimination, violates the antitrust laws of the United States and is unequivocally destructive to competition and consumer welfare in the marketplace. For this reason, the Court grants the defendants' motion for partial summary judgment as to those claims in which the plaintiffs' conspired by doing business as COMPACT.

## I. *Facts*

In 1981 the Metropolitan Nashville Airport Authority [MNAA] began construction to expand the airport which services the City of Nashville, Tennessee. Early in 1984 MNAA entered the design development phase for the new terminal facility. During the spring of 1984, Gresham and Smith, a large architectural firm based in Nashville, was awarded the contract as the principal contractor for developing the design of the new terminal. Gresham and Smith was selected from among a group of other architectural firms; a number of minority business enterprise [MBE] firms were represented in the group whose bids were rejected.

In May of 1984 the three minority-owned architectural firms in Middle Tennessee—McKissack, McKissack & Thompson Architects & Engineers, Inc.; L. Quincy Jackson (doing business as a sole proprietor); and Harris Associates—entered into an agreement to form the Coalition for Equitable Minority Participation In Architectural Contracts in Tennessee [COMPACT].[1] COMPACT was formed with the purpose of ameliorating the effects of racial discrimination against black architects in Tennessee. Its members believed each individual firm's failure to win the principal contractor position on the design phase of the airport project was attributable directly to racial discrimination by MNAA. Accord-

ingly, the members of COMPACT agreed to band together in a "joint venture" to present a united front for negotiating contracts on projects seeking minority business participation.

Pursuant to the joint venture agreement, COMPACT retained the right to target construction projects it desired to pursue and, once chosen, its members covenanted not to pursue work on such projects in their individual capacities or to associate themselves in any way with the project except in their role as members of COMPACT. Section 5 of the COMPACT agreement provides:

> 5. COMPACT shall delineate specifically and in writing the areas of marketing for architectural contracts which it wishes to pursue on a joint venture basis for the benefit of its members and shall also designate specifically the areas which members are free to pursue in their own private marketing activities apart from COMPACT. *No member shall pursue or accept as an individual firm without agreement of all members of COMPACT in writing in advance, any project which COMPACT has targeted or is pursuing in any way as a potential project for COMPACT.*

(emphasis added). In similar language, Article V of the COMPACT Bylaws empowers COMPACT to target contracts and restrict competition between its individual members.

Although the COMPACT agreement did not limit the Coalition's scope, the initial targets selected were the Metropolitan Nashville Airport Terminal and the Nashville Convention Center—both public projects. More than just the large expenditures budgeted, COMPACT's members knew that the probable involvement of federal funds made procurement of minority business enterprise participation a condition precedent to a state agency and/or principal contractor's reimbursement by the federal government for performance on the contract.[2] In the context of the Nash-

---

1. Plaintiffs assert in their complaint that their three firms represent the only black-owned architectural firms in Middle Tennessee. Together the three firms represent the membership composition of COMPACT. Complaint at ¶ 2(a).

2. Pursuant to 15 U.S.C.S. § 637(d), "small business concerns owned and controlled by socially and economically disadvantaged individuals" are to be afforded "the maximum practicable

ville airport contract, MNAA had adopted and implemented an affirmative action program creating MBE set-aside guidelines consistent with the standards prescribed by federal law. Deposition of Mr. Thomas L. Mertins and Exhibit 1 (August 23, 1984).

On July 3, 1984, a meeting was held at MNAA's office. In attendance were members of COMPACT, and representatives of MNAA, the Federal Aviation Administration and Gresham and Smith. Among the topics discussed—and made clear—was the requirement that there be sufficient MBE participation in the design phase subcontracts let out by Gresham and Smith. Deposition of William D. Schock at 7–10 (August 23, 1984). The situation, therefore, was ripe for COMPACT to test its new marketing strategy.

Prior to commencing the terminal design phase of the project, MNAA had maintained an average of nine (9) percent MBE participation across the other construction contracts. Deposition of Thomas L. Mertins at 52–53, exhibit No. 4 (August 23, 1984). However, by uniting all minority architects in the area under COMPACT, and with the knowledge of MNAA's preference for local contractors, the individual members expected to exert monopolistic leverage on Gresham and Smith to force it to accede to COMPACT's demand for a more substantial participation share of the design contract. Testimony of L. Quincy Jackson, transcript at 117, 131–32. Mr. Jackson testified that he refused to accept any correspondence sent by Gresham and Smith which was addressed to him in his individual capacity; he and the other black architects in Nashville would negotiate on participation only through COMPACT. *Id.* at 87, 97, 146.

When members of COMPACT finally did meet with Gresham and Smith, COMPACT rejected an offer to "associate" on the project (i.e., to perform a subcontract constituting 10 percent or less of the value of the entire project), and demanded a "joint venture." Although members of COMPACT varied in their interpretation of the meaning of "joint venture," this Court understands the term to contemplate if not a 50 percent interest then one carrying substantial responsibility and decision making authority. *Compare* Testimony of Leatrice McKissack, transcript at 56–57; *with* Testimony of L. Quincy Jackson, transcript at 118; *and* Testimony of Harold Thompson, transcript at 164. Faced with the demand to "split the pie in half," Gresham and Smith simply went elsewhere.[3] It reached an agreement with Williams, Russell & Johnson, a minority-owned architectural firm based in Atlanta licensed to practice in Tennessee.

MNAA's selection of Gresham and Smith over all of the minority firms, followed by Gresham and Smith's selection of Williams, Russell & Jackson over COMPACT precipitated the instant case. COMPACT and its members filed suit claiming violations of their civil rights under 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1988, 2000d; 15 U.S.C. § 1, *et seq.;* T.C.A. § 47–25–101; and other applicable laws. Following the issuance of a temporary restraining order prohibiting Gresham and Smith from retaining Williams, Russell & Jackson as associate architects, this Court heard testimony on the propriety of a preliminary injunction, at which time the possible antitrust implications of the COMPACT agreement became apparent. The Court dissolved the TRO and refused issuance of a preliminary injunction. On direction by the Court both sides briefed the antitrust issue, the defendants submitting their position in the form of a motion for summary judgment. Following oral argument on the defendants' motion and after consideration of the

opportunity to participate in the performance of contracts let by any Federal agency." 15 U.S. C.S. § 637(d) (Supp.1982).

**3.** Prior to entry into this phase of the construction, architectural work on the airport facility was performed by way of a joint venture between Gresham and Smith and Reynolds, Smith and Hill, a Florida firm. MNAA, however, believed that the design phase for the terminal building would be conducted most efficiently if directed by a single architectural firm. Deposition of Thomas L. Mertins, at 27–28. Accordingly, MNAA ended the joint venture upon entry into the design phase and awarded the prime contractor position to Gresham and Smith.

already voluminous documents, transcripts, depositions and pleadings in the case, and the testimony of witnesses in open court, the Court concludes that the COMPACT agreement constitutes a *per se* violation of Section 1 of the Sherman Act and, accordingly, grants the defendants' motion for partial summary judgment dismissing the plaintiffs' claims regarding construction of the airport.

## II. *Minority Business Enterprise Participation as a Discrete Submarket in Public Contracts*

To gain insight on the competitive impact of COMPACT's operation, one must first examine the market in which Tennessee architects do business and the reasons minority architects may have felt compelled to band together to form COMPACT. The majority of architectural services in Middle Tennessee are performed by white-owned firms. A variety of factors may explain why white firms are dominant, but chief among them is the simple fact that of the 341 licensed architects in Davidson County, Tennessee, 311 are white and 30 are black. 1980 Census, Detailed Occupation of the Civilian Labor Force, Davidson County, Tennessee, EOS, Table 1 (1980).[4]

Testimony before the Court portrayed a system in which public contracts usually were headed by white firms, serving as prime contractors, with subcontracts awarded to minority firms. The plaintiffs claim that the principal reason motivating the white firms to award these contracts to minority firms was to satisfy the affirmative action guidelines promulgated by the public agency in charge of the project. In order to satisfy the minority participation obligation but, at the same time, keep such

participation at the threshold minimum, the white-owned prime contracting firm would solicit bids from each of the three Middle Tennessee minority architectural firms (the plaintiffs) and then set each against the other so that one would underbid the other. The plaintiffs claim that the inevitable and consistent result of the practice was that the minority architectural firms in Nashville would never procure more than a token share of the entire project.

The plaintiffs claim that the system has been the *modus operandi* in Middle Tennessee for years and that only after being excluded from the prime contractor position on the airport contract did the three minority firms decide to take matters into their own hands in an attempt to increase their bargaining power so as to obtain larger shares of the contracts. Testimony of L. Quincy Jackson, Transcript at 132 (August 17, 1984). By combining into a "joint venture" under COMPACT, the three minority firms attempted to eliminate competition among themselves. If a prime contractor was required by law to have minority participation and the only qualified minority business enterprise was COMPACT, then it stood to reason that COMPACT would be able to dictate the terms under which it would agree to participate.[5]

This Court finds that as a matter of law minority business enterprise set-aside shares on public contracts represent a discrete submarket for architectural services in which only qualified minority firms may compete.[6] Under 15 U.S.C. § 637(d)(8), a contractor who fails to extend to minority subcontractors the "maximum practicable opportunity to participate in the performance of contracts let by any Federal agen-

---

**4.** The Court takes judicial notice of the census figures pursuant to Rule 201 of the Federal Rules of Evidence.

**5.** It is interesting to note that although the COMPACT agreement did not limit COMPACT's jurisdiction to only public contracts, the only two projects targeted at this point are the Nashville Airport Terminal and the Nashville Convention Center—both public contracts.

**6.** The Court finds the concepts of markets and submarkets, though traditionally applied in

merger cases, are particularly appropriate to describe the business opportunities for architectural services in this case. The market as a whole is the market for architectural services offered to the entire community. The submarket identified by the Court today constitutes the statutorily mandated set aside share of public contracts reserved exclusively for minority business enterprises, plus any overlapping or additional share mandated by the affirmative action guidelines of a public agency which are not prescribed by statute.

cy" may be declared in breach of its contract. And though "maximum practical opportunity" is not defined in the statute, the target generally imposed by federal agencies is approximately ten (10) percent minority participation.

The facts in this case support the Court's finding that in the context of public contracts there exists a discrete market for minority architectural services. Gresham and Smith was advised by the MNAA and the FAA as to its duty to procure minority participation. Further, testimony as to custom in the overall architectural market reflects the well established practice by white firms of obtaining minority firm participation when seeking public contracts. In joining together, the member firms of COMPACT did not attempt to increase their market power in the general architectural market for Middle Tennessee, they sought to monopolize the submarket for minority business participation in public contracts.[7] Accordingly, any consideration of the competitive significance of COMPACT's operation must focus on its competitive impact in the submarket and in the general market as a whole.

### III. *The Sherman Antitrust Act*

Section 1 of the Sherman Act provides that "[e]very contract, combination, in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal ..." 15 U.S.C. § 1 (1976). Although any agreement between businessmen places some restrictions on trade, courts have interpreted the Sherman Act to condemn only those arrangements which are "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States,* 221 U.S. 1,

65, 31 S.Ct. 502, 517, 55 L.Ed. 619 (1910). The Sherman Act protects this nation's free enterprise system by mandating that competition between entrepreneurs be the principal motivating force in the marketplace. And while judicial pronouncements during the last fifty years have varied on the central policy intended by Congress in its enactment of the Sherman Act, the current consensus among both courts and commentators embraces consumer welfare as the objective served by enforcement of the antitrust laws.

### A. *Enforceability of the Sherman Act Against COMPACT and its Members.*

COMPACT and its members contend vigorously that their conduct is insulated from antitrust liability under first amendment protections guaranteeing freedom of speech, freedom of association, and the right to petition government for redress of their grievances. COMPACT urges that because its members are protesting racial discrimination the *Noerr-Pennington* doctrine permits collusion among competing architects to jointly obtain and then parcel out minority business enterprise shares on public contracts. COMPACT, however, misinterprets the purpose and scope of *Noerr-Pennington*—the doctrine does not permit individuals to band together and exercise their new-found leverage directly in the marketplace.

■ The *Noerr-Pennington* doctrine recognizes that in light of the basic constitutional right of all citizens to petition government, individuals have a right to lobby legislative and administrative bodies to pass or repeal laws and regulations that protect their particular interests. *See, generally,* 1 P. Areeda and D. Turner, *Anti-*

---

7. The Court finds that the actions taken by COMPACT and its members raise issues under both Sections 1 and 2 of the Sherman Act. However, for purposes of this decision, the Court bases its holding on Section 1 of the Sherman Act, granting the defendants' motion for summary judgment in light of the plaintiffs' *per se* unlawful allocation of markets and price fixing.

The attempt to monopolize the market for MBE set aside shares on public contracts is implicated by today's decision, yet no firm reso-

lution as to that possible Section 2 claim can be made without a full trial on the merits. *Swift v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905) (requiring a showing of an attempt to monopolize and a dangerous probability of success); *cf. White Motor Co. v. United States,* 372 U.S. 253, 264, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963) (whether a merger tends to "substantially lessen competition" normally requires a trial rather than the use of summary judgment).

*trust Analysis* ch. 2A (1978). In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), truckers challenged the lobbying efforts of a group of railroads that had resulted in the enactment of Pennsylvania legislation which imposed detrimental regulation on trucks. In ruling for the railroads, the Supreme Court held that in the absence of bad faith or an intent to harass, such activity was privileged and immune from attack under the antitrust laws. *Id.* at 140–45, 81 S.Ct. at 531–32. The doctrine was expanded to protect those who petition administrative bodies performing quasi-legislative duties in *United States v. Pennington*, 381 U.S. 657, 669–70, 85 S.Ct. 1585, 1592–93, 14 L.Ed.2d 626 (1965) (United Mine Workers permitted to petition the Secretary of Labor to modify regulations governing the sale of coal).

■ What is germane to these cases is the basic principal that the Constitution protects *political* activity by citizens when addressing government in its *legislative* capacity. There is no such protection of *commercial* activity by businessmen when dealing with government in its *proprietary* capacity. COMPACT's activities fall squarely within the latter of the two categories. "In the absence of legislation or a valid quasi-legislative ruling, a private person dealing with government as buyer, seller, lessor, lessee, or franchisee has no greater antitrust privilege or immunity than in similar dealings with non-governmental parties." 1 P. Areeda and D. Turner, *Antitrust Analysis* at 52. The fact that COMPACT sought to defeat racial discrimination or that they sought to do so in the context of public contracts is immaterial. COMPACT sought to achieve its goal of meaningful minority participation by demanding a joint venture with Gresham and Smith, not through lobbying efforts before the Tennessee legislature or Congress. In sum, COMPACT's actions were taken in the marketplace and are subject to full scrutiny under the Sherman Act.

## B. *Proper Standard of Judicial Analysis*

■ There are two complementary categories of antitrust analysis used by the courts for evaluating the legality of commercial conduct: the *per se* rule and the rule of reason. As Justice Stevens has observed:

> In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are "illegal per se"—in the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed. *In either event, the purpose of the analysis is to form a judgment about the competitive significance of the restraint;* it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry.

*National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) (emphasis added). Accordingly, regardless of which standard of analysis this Court chooses to apply, the Court will consider COMPACT's conduct only in light of its *competitive significance.* Just as the Supreme Court in *National Society of Professional Engineers*, refused to consider the social merit of an ethical canon prohibiting competitive bidding between engineers, this Court will not weigh the value of COMPACT's avowed goal to overcome racial discrimination in ascertaining the competitive significance—and legality—of the coalition's similar prohibition on competitive bidding and other restrictive covenants. *See also Organization of Minority Vendors, Inc. v. Illinois Central Gulf Railroad*, 579 F.Supp. 574, 604–05 (N.D.Ill. 1983) ("[t]he notion that group conduct is somehow outside the scope of the antitrust laws if it has salutory non-economic purposes even though it has economic impact has found little favor in the courts").

### 1. *Joint Ventures*

The plaintiffs maintain that COMPACT constitutes a "joint venture" between minority-owned architectural firms and, as such, represents a legitimate combination by which, through increased productive capacity, they may more effectively pursue general contractor positions and/or larger subcontractor opportunities on government construction projects. COMPACT maintains further that since the combination is a joint venture the rule of reason is the proper mode of antitrust inquiry for this Court and, as a consequence, summary judgment is improper without an in-depth review of the coalition's impact on competition.

Joint ventures present a difficult concept for antitrust analysis, defying neat classification and precise definition and, by extension, well established rules for evaluating their competitive impact. *See generally,* Pitofski, *Joint Ventures Under the Antitrust Laws: Some Reflections on the Significance of Penn-Olin,* 82 Harv.L.Rev. 1007, 1034–38 (1968). This Court defines a joint venture as a separate enterprise characterized by an integration of operations between and subject to control by its parent firms which results in the creation of significant new enterprise capability in terms of new productive capacity, new technology, a new product, or entry into a new market. Brodley, *Joint Ventures and Antitrust Policy,* 95 Harv.L.Rev. 1523, 1526 (1982). On one hand, the joint venture provides a method of organization which enables competitors to join together to produce that which is beyond the productive capacity or inclination of its individual members. Conversely, the joint venture threatens to reduce actual or potential competition between rivals by providing a method of operations which engenders collusion detrimental to competition. In the instant case, the issue turns on whether COMPACT's operations create significant new productive capacity in the architectural product market already served by the coalition's members in their individual capacities, or, stated another way, whether the whole is greater than the sum of its parts. *Broadcast Music, Inc. v. Columbia*

*Broadcasting System, Inc.,* 441 U.S. 1, 21–22, 99 S.Ct. 1551, 1563–64, 60 L.Ed.2d 1 (1979). This Court thinks not.

■■■ A court must be guided by the facts, rather than the legal characterizations the parties attach to the facts. Individuals who normally compete directly against one another may not hide the collusive nature of mutual concessions by labelling their agreements "joint ventures." *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 598, 71 S.Ct. 971, 974, 95 L.Ed. 1199 (1951). A central consideration in assessing the competitive character of a joint venture focuses on whether the individual participants are free to increase their own output. *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma,* — U.S. ——, —— n. 54, 104 S.Ct. 2948, 2968 n. 54, 82 L.Ed.2d 70 (1984), *citing* Brodley, *Joint Venture and Antitrust Policy, supra,* at 1523, 1550–52, 1555–60. In *NCAA,* the Supreme Court found that the NCAA's policies for negotiating and awarding television rights to broadcast networks on behalf of its member schools violated the Sherman Act since the joint venture arrangement, though assuring broad-based coverage of all its members, had the effect of limiting the volume of television rights available for purchase by the networks. The guarantee, for example, that a small, unranked college receive television coverage of its football games at least once during a two-year period carried with it the opportunity cost of limiting more frequent broadcasts of, what consumers probably would deem the more interesting, Georgia and Michigan games. Saturday afternoon's televised football agenda was the product of a social policy agreed on by the NCAA rather than a medium responsive to the competitive force of consumer demand.

The *NCAA* case is analogous to the present action to the extent that the COMPACT agreement precludes individual members of the coalition from competing for contracts on projects designated for exploitation by COMPACT. In *NCAA* the NCAA designated the entire televised foot-

ball product market, prohibiting any of its members for negotiating in their individual capacities for television rights. Similarly, COMPACT's blanket prohibition on its individual members' right to compete for the airport contract preempts competition between COMPACT and its members and, also, between the individual COMPACT members themselves. Net productive capacity of all members of COMPACT is not increased by COMPACT's operation, it is reduced. Consumer welfare is compromised by COMPACT's operation.

In seeking minority participation on the design phase of the airport, Gresham and Smith solicited each minority architectural firm individually inviting them to submit separate bids. Refusing to bid, each firm staked their participation on Gresham and Smith's acceptance of COMPACT's demand for joint venture (i.e. equal control) status—which was rejected. Had the minority firms been free to bid individually against each other (admittedly for more modest participation shares) and, at the same time, submit their COMPACT joint venture proposal, the architects would have increased the net productive capacity of the group by offering to Gresham and Smith and MNAA the traditional choice of each firm's respective services plus an option for joint services previously not available.[8] The COMPACT arrangement restricts the supply of qualified minority architects available to participate in the construction of the airport—where before there were three Middle Tennessee minority-owned enterprises offering architectural services from which to choose, now there is only one. The terms of the joint venture restricts the coalition members opportunity to participate in the construction of the airport to COMPACT's "all or nothing" terms.

While joint ventures traditionally have been subject to the rule of reason, *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), federal courts will not hesitate to apply the *per se* rule to impose Section 1

liability upon a finding of some intrinsic or ancillary aspect of the joint venture agreement which falls within the well-defined parameters of the *per se* rule. *Timken Roller Bearing Co. v. United States*, 341 U.S. at 598, 71 S.Ct. at 974, ("[n]or do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labelling the project a 'joint venture.' "); *Engine Specialities, Inc. v. Bombarbier, Inc.*, 605 F.2d 1, 8 (1st Cir.1979) *cert. denied*, 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980) ("the nomenclature 'joint venture' does not automatically exempt a combination from the per se rule which is found to have elements inherently offensive to the antitrust laws"). The principal task of this Court, then, is to examine the COMPACT agreement to ascertain whether any of its terms may be characterized as *per se* unlawful restraints of trade.

### 2. *Horizontal Allocation of Territories and Customers*

Plaintiffs argue that the COMPACT agreement does not violate the antitrust laws since it does not specifically limit competition between its members. The plaintiffs point to Paragraph 5 of the COMPACT contract claiming that its language demonstrates that the arrangement between the architects is merely "an agreement to agree." Plaintiff's Brief Opposing Summary Judgment at 3. Although the Court agrees that Paragraph 5 does in fact represent an "agreement to agree," it reaches an opposite conclusion as to the legality of the provision. The Court interprets Paragraph 5 as an agreement between competitors to conspire to allocate territories, customers and contracts and to fix the price of minority architect participation on public contracts.

Paragraph 5 of the COMPACT contract provides:

> to more rigorous scrutiny had it been subject to competition from bids by each of the individual member firms of COMPACT.

---

**8.** Additionally, the bid specifications of Williams, Russell and Johnson, the firm chosen by Gresham and Smith, would have been subjected

5.  COMPACT shall delineate specifically and in writing the areas of marketing for architectural contracts which it wishes to pursue on a joint venture basis for the benefit of its members and shall also designate specifically the areas which members are free to pursue in their own private marketing activities apart from COMPACT. No member shall pursue or accept as an individual firm without agreement of all members of COMPACT in writing in advance, any project which COMPACT has targeted or is pursuing in any way as a potential project for COMPACT.

Unlike the traditional notion of a joint venture—a well-defined common undertaking in pursuit of a single transaction or series of transactions—the COMPACT agreement is open-ended and without parameters defining the scope of the venture. The COMPACT agreement provides for the creation of a common "clearinghouse" through which all Middle Tennessee minority-owned architectural firms may come together, discuss any and all potential contracts, and then decide whether joint pursuit or competition among themselves best serves the interests of each member of the group.

The plaintiffs assert that because they are black their actions are tied to the crusade against racial discrimination and are therefore immune from antitrust liability. What they ignore, however, is that Congress has enacted legislation aimed specifically at redressing the effects of racial discrimination: the Civil Rights Act of 1871, 42 U.S.C. §§ 1981–1986, and affirmative action set asides for minority business enterprise participation in public contracts, 15 U.S.C. § 637(b) (1976).[9] Private conspiracies in restraint of trade simply are not an available option. If the individual member firms of COMPACT believed that they were subject to racial discrimination in MNAA's selection of Gresham and Smith as the prime contractor on the design phase of the airport construction, or that they systematically were being excluded from

other contracting opportunities, their remedy in the federal courts lay in seeking redress under the Civil Rights Act, not by way of a private self-help remedy that violates the Sherman Act.

The horizontal division of markets has long been recognized as a patently anticompetitive arrangement between business competitors and, accordingly, has been subject to *per se* illegal treatment by courts. Allocation of markets—whether of territories or customers—tampers with free market forces by reducing or eliminating competition between business rivals, thereby reducing the incentive to increase productivity, to implement innovative strategy and to devise methods to better serve consumers.

■ A horizontal allocation of markets is characterized by three elements: (1) concerted action between two or more persons; (2) actual or potential competition between the participants in the conspiracy; and (3) an elimination of competition in the market serviced by the conspirators.  2 E. Kintner, *Federal Antitrust law* § 10.42 (1980). One of the admitted purposes of COMPACT's formation is to eliminate competitive bidding between its members. This Court finds the arrangement falls squarely within the *per se* rule uniformly applied by federal courts condemning a cooperative or coalition's allocation of territorial regions of exclusive jurisdiction to its members. *United States v. Topco Associates*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972) ("[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act"); *United States v. Sealy*, 388 U.S. 350, 357, 87 S.Ct. 1847, 1852, 18 L.Ed.2d 1238 (1967); *Timken Roller Bearing Co. v. United States*, 341 U.S. at 598–601, 71 S.Ct. at 974–76 (regardless of the justifications presented by problems in international trade, allocation of territories between in-

---

9. As the Court observed above, MNAA seems to have been successful in providing minority business enterprises the maximum practicable opportunity to participate in the construction of the new airport facility. In most cases, MNAA was able to meet the targets specified in its affirmative action program.

ternational cartel members is *per se* unlawful). In *Topco Associates,* the Supreme Court applied the *per se* rule to strike down a cooperative association's assignment of sales zones to each of approximately twenty-five small to medium-sized supermarkets. The Court observed:

> One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.... This Court has reiterated time and time again that "[h]orizontal territorial limitations ... are naked restraints of trade with no purpose except stifling of competition." *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963).

*Id.* at 608, 92 S.Ct. at 1134. Although plaintiffs' counsel argue that no allocation of territories was intended nor occurred, the testimony of the plaintiffs themselves does not support their position. Officers of each of the three minority architectural firms stated that they intended to increase their bargaining power by eliminating competition between themselves.

■ Alternatively, the plaintiffs contend that the language of Paragraph 5 does not contemplate the division of territories, but rather the delineation of "subject matter areas." Plaintiffs' Brief Opposing Summary Judgment at 3. The plaintiffs cannot avoid the antitrust laws through amorphous definition. Regardless of the semantic characterization, a horizontal allocation of any element of the market for which businessmen or professionals compete represents a *per se* violation of the Sherman Act. *See, e.g., United States v. Cadillac Overall Supply,* 568 F.2d 1078, 1088 (5th Cir.), *cert. denied,* 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978) (applying *per se* rule to horizontal allocation of customers); *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 574–75 (2d Cir. 1961); (territories and customers); *United States v. Pennsylvania Refuse Removal Association,* 242 F.Supp. 794, 798–99 (E.D. Pa.1965) *aff'd* 357 F.2d 806 (3d Cir.1966), *cert. denied,* 384 U.S. 961, 86 S.Ct. 1588, 16 L.Ed.2d 674 (1966) (territories and customers).

### 3. *Agreements to Refrain from Bidding*

■ COMPACT's demand for joint venture status with Gresham and Smith on the terminal design phase of the airport construction together with its members' refusal to deal in their individual capacities represents a genre of price fixing. COMPACT's operation stabilizes the price of minority business enterprise participation on government contracts insofar as the COMPACT agreement prevents individual minority-owned firms from bidding on designated projects and requires the firms to come together to exchange price and performance data in setting a joint bid and determining how to split up the work and profits. In *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940), the Supreme Court stated:

> Any combination which tampers with price structures is engaged in unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces.

The concept of "price fixing" has been given broad application to condemn a wide variety of practices, far exceeding the conventional image of the smoke-filled backroom in which competitors wrangle over how much each shall charge the public for their common product. The *per se* rule applies full force to conduct which has only the indirect effect of fixing or, more appropriately to this case, stabilizing prices. *General Cinema Corp. v. Buena Vista Distribution Co.,* 532 F.Supp. 1244, 1256–57 (C.D.Cal.), *aff'd* 681 F.2d 594 (9th Cir. 1982) (condemning as *per se* illegal price fixing "split of product agreements" under which movie theater operators and agreed to divide "first rights of negotiation" with film distributors for newly-released feature films). In *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d

637 (1978), the Supreme Court ruled that the elimination of competitive bidding pursuant to the Society's ethical canons, though technically not price fixing, constituted a *per se* unlawful conspiracy "interfer[ing] with the setting of price by free market forces."[10] Similarly, in this case, the agreement by each COMPACT member to refrain from bidding COMPACT-designed contracts and to pursue those projects only under the banner of COMPACT represents an attempt to peg the price of minority participation.

The plaintiffs' impress upon the Court that their three firms employ the great majority of black architects in the Middle Tennessee area. Assuming the position is correct, COMPACT's election to pursue a particular public contract eliminates competitive bidding between the majority of MBEs for the minority business set aside share of the project.[11] If only one entity bids on a contract, the persons who control the entity have the ability to set the terms—and the price—of the contract.

■ While the COMPACT arrangement is not bid rigging nor price fixing as such, there is little difference in terms of the anticompetitive impact. *See United States v. Koppers Co., Inc.*, 652 F.2d 290, 293–96 (2d Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981). An agreement between competitors that creates a joint venture having the power to direct individual competitors to refrain from bidding on contracts interferes with the free market price structure.

The reasonableness of prices has no constancy due to the dynamic quality of business facts underlying price structures. Those who fixed reasonable prices today would perpetuate unreasonable prices tomorrow, since those prices would not be subject to continuous administrative supervision and readjust-

ment in light of changed conditions. Those who controlled the prices would control or effectively dominate the market. And those who were in that strategic position would have it in their power to destroy or drastically impair the competitive system.

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. at 221, 60 S.Ct. at 843.

■ An examination of the provisions of settlement decrees entered in cases involving bid rigging supports this Court's position that joint bidding arrangements between competitors on construction projects is impermissible absent a showing that the work specifications contained in the bid cannot be performed without such a combination, *United States v. New England Concrete Pipe Corp.*, 1959 Trade Cas. (CCH) ¶ 69,481 (D.Mass.1959), or that the joint venture is to be undertaken to produce a product not currently made by any of the joint venturers, or that the product cannot be made competitively by just one of the participants. *United States v. General Electric Co.*, 1962 Trade Cas. (CCH) ¶ 70,367 (E.D.Pa.1962); *see also United States v. Bituminous Concrete Association, Inc.*, 1960 Trade Cas. (CCH) ¶ 69,878 (D.Mass.1960); *United States v. Lake Asphalt and Petroleum Co. of Massachusetts*, 1960 Trade Cas. (CCH) ¶ 69,835 (D.Mass.1960). In the instant case, the combination between minority architects is not necessary to enable the firms to perform the design work sought.

The plaintiffs argue that if their conduct is to be subjected to antitrust scrutiny, then the recent decision in *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, —— U.S. ——, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), directs this Court to apply the rule of reason. In *NCAA*, the Supreme Court

---

**10.** Although Justice Stevens' opinion in *National Society of Professional Engineers* appears to rest heavily on the application of the rule of reason, this Court agrees with the reading given by a number of other federal courts that the *per se* rule actually was applied to condemn the Society's prohibition on competitive bidding. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647–48, 100 S.Ct. 1925, 1927–28, 64 L.Ed.2d 580

(1980); *General Cinema Corp. v. Buena Vista Distribution Co.*, 532 F.Supp. 1244, 1256 and n. 7 (C.D.Cal.), *aff'd* 681 F.2d 594 (9th Cir.1982).

**11.** What the members of COMPACT did not foresee was that Gresham and Smith would look outside the immediate area to procure a qualified minority architect to satisfy MNAA's affirmative action objectives.

carved out an exception to the *per se* rule's applicability to price fixing conspiracies in light of the nature of the industry.

> [W]hat is critical is that this case involves an industry [i.e., college football] in which horizontal restraints in competition are essential if the product is to be available at all.

> As Judge Bork has noted: "[S]ome activities can only be carried out jointly. Perhaps the leading example is league sports. When a league of professional lacrosse teams is formed, it would be pointless to declare their cooperation illegal on the ground that there are no other professional lacrosse teams." R. Bork, *The Antitrust Paradox* 278 (1978). What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete.... [T]he integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed that otherwise would be unavailable. In performing its role, its actions wide consumer choice ... and hence can be viewed as procompetitive.

*National Collegiate Athletic Association,* — U.S. at ——, 104 S.Ct. at 2961. Plaintiffs seek to draw an analogy to their situation, claiming that minority participation is impossible without joint action among all minority architects. This Court disagrees. As the Court has observed throughout the opinion, if participation on public contracts by individual firms has been prohibited by a conspiracy to exclude minority businesses, then the Civil Rights Act affords the individual victims redress by way of a private cause of action. The Court rejects the plaintiffs' position that minority architectural services can be marketed effectively only through a joint venture. There simply is no similarity between the college football industry and the architectural profession. Procompetitive efficiencies are generated, rather than reduced by competition between minority architectural firms. Elimination of such competition compromises consumer welfare and, hence, runs afoul of Section 1 of the Sherman Act.

## IV. The Propriety of Summary Judgment

COMPACT's failure to procure joint venture status with Gresham and Smith on the airport contract motivated the joint venture and its individual members to seek alternative redress via a claim of racial discrimination under the Civil Rights Act. This Court, however, will not grant relief which will further the objectives of an unlawful conspiracy. *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association,* 546 F.Supp. 1276, 1327 (E.D.Okla.1982), *aff'd in part, remanded in part* 707 F.2d 1147 (10th Cir. 1983), *aff'd* —— U.S. ——, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("it would be unseemly for the Court having found an overt violation of the antitrust laws, to allow the violation to continue for even a single day ..."). In light of this Court's determination that COMPACT violates the Sherman Act, the Court is compelled to grant the defendant's motion for summary judgment on those claims involving illegal conduct by the individual plaintiffs. *Continental Wall Paper Co. v. Louis Voight & Sons,* 212 U.S. 227, 267, 29 S.Ct. 280, 294, 53 L.Ed. 486 (1909) (affirming summary dismissal of plaintiff's claims in light of the plaintiff's role in a price-fixing conspiracy, stating that the Court would not render "a judgment [which] would, in effect, aid the execution of agreements which constituted [an] illegal combination").

Summary adjudication is used sparingly in antitrust cases. *Poller v. Columbia*

**1580**

*Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Ron Tonkin Gran Turismo v. Fiat Distributors,* 637 F.2d 1376, 1381 (9th Cir.) *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981) ("general reluctance does not preclude the use of summary judgment in antitrust litigation"); *see generally* 2 P. Areeda and D. Turner, *Antitrust Analysis* ¶ 316 (1980). Usually, the facts presented before the Court are complex and require an extended probe into industry structure, the parties' conduct and the economic nuances raised by the disputed actions. Almost without exception, summary judgment is appropriate only when the conduct at issue falls clearly within those categories of practices traditionally treated as *per se* unlawful or when the allegations in the complaint clearly fail to establish a material issue of fact for adjudication.

As discussed above, the horizontal division of geographic markets, allocation of customers and price fixing are practices which federal courts long have regarded as *per se* illegal. And while the Supreme Court in recent years has carved out exceptions to the *per se* rule and mandated rule of reason analysis be given to certain practices, *see, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (non-price vertical restraints), the Supreme Court consistently has reaffirmed its position that the *per se* rule has continuing vitality particularly in its application to horizontal conspiracies involving price-fixing and division of markets.

*Per se* treatment of the practices engaged in by COMPACT serve important policies promoting the enforcement of antitrust laws. First, businessmen are given a "bright line" demarcating the division between permissible commercial conduct and that which is proscribed. The "bright line" provides valuable assistance to businessmen in planning their commercial strategies, affording them a measure of predictability as to the risks of antitrust liability for any contemplated scheme. Second, if the history of antitrust law demonstrates

anything it is that "elaborate inquiry into the reasonableness of challenged business practices entails significant costs." *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, at 343, 102 S.Ct. 2466, at 2472, 73 L.Ed.2d 48 at 58 (1982). Application of the *per se* rule results in judicial efficiency by formalizing the legal conclusion that certain business practices are by their very nature anticompetitive, pernicious and without redeeming value. *Northern Pacific Railway v. U.S.,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The *per se* rule avoids the situation found in many rule of reason cases charac. terized by documents running into the millions of pages and litigation occupying years of court time. *Broadcast Music, Inc.,* 441 U.S. at 8, n. 11, 99 S.Ct. at 1556, n. 11. (the *per se* rule serves to benefit all concerned by avoiding "the necessity for an incredibly complicated and prolonged economic investigation ...—an inquiry so often wholly fruitless when undertaken"). While this Court hesitates to enforce the *per se* rule, it will apply it when the conduct challenged clearly warrants such treatment. It is appropriate in this case.

■ This Court need not conduct an elaborate inquiry into the structure of the architectural industry or the market power of COMPACT and its members to conclude that the COMPACT agreement is anticompetitive. *National Society of Professional Engineers,* 435 U.S. at 697, 98 S.Ct. at 1368. Proof of the conspirators' market power is unnecessary upon a finding that an agreement represents a naked restraint on trade. *NCAA,* —— U.S. at ——, 104 S.Ct. at 2964; *Klor's Inc. v. Broadway Hale Stores, Inc.,* 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959). In *White Motor Co. v. United States,* 372 U.S. 253, 259–60, 83 S.Ct. 696, 699–700, 9 L.Ed.2d 738 (1963), the Supreme Court stated that once a party establishes the existence of a horizontal conspiracy to divide markets, fix prices, or group boycott "a trial to show their nature, extent, and degree is no longer necessary." In that case, the Supreme Court affirmed in part and reversed in part the district court's entry of summary judgment against a truck manu-

facturer shown to have engaged in a conspiracy with its distributors to allocate territories, fix prices, and impose group boycotts. The Court affirmed summary judgment as to the price fixing count but reversed and remanded the case as to the territorial allocation and customer limitation charges. The Court reversed judgment on these latter claims since they involved *vertically* imposed restraints, which the Court has recognized as potentially procompetitive and, therefore, deserving of full consideration at trial. *Id.* at 263–64, 83 S.Ct. at 702–03. In this case, however, the restraints are *horizontally* imposed between actual competitors and, as the *White* Court observed, lack any possible procompetitive efficiencies which would warrant a full trial. *Id.* at 263, 83 S.Ct. at 702.

### V. *Conclusion*

This Court finds that COMPACT and its members have violated Section 1 of the Sherman Act by conspiring to divide markets and to interfere with the bidding structure for public contracts. The conspiracy is *per se* illegal. The Court need not inquire further into the plaintiffs' motives, their market power, or other aspects of the industry in which they do business. The Court grants partial summary judgment against the plaintiffs as to those claims against MNAA, Gresham and Smith, Williams, Russell and Johnson and the Metropolitan Government of Nashville and Davidson County, Tennessee, charging those defendants with conspiring to violate the Civil Rights Act and the Sherman Act with respect to the construction of the airport. The other counts in the plaintiffs' complaint challenge actions taken against each of the plaintiffs in the individual and/or firm capacities. The Court finds that these matters continue to present issues for adjudication.